ADDERLEY ET AL. *v.* FLORIDA.

No. 19.   Argued October 18, 1966.—Decided November 14, 1966.

*Richard Yale Feder* argued the cause for petitioners. With him on the brief was *Tobias Simon.*

*William D. Roth,* Assistant Attorney General of Florida, argued the cause for respondent, *pro hac vice,* by special leave of Court. With him on the brief was *Earl Faircloth,* Attorney General.

MR. JUSTICE BLACK delivered the opinion of the Court.

Petitioners, Harriett Louise Adderley and 31 other. persons, were convicted by a jury in a joint trial in the County Judge's Court of Leon County, Florida, on a charge of "trespass with a malicious and mischievous intent" upon the premises of the county jail contrary to § 821.18 of the Florida statutes set out below.[1] Petitioners, apparently all students of the Florida A. & M. University in Tallahassee, had gone from the school to the jail about a mile away, along with many other students, to "demonstrate" at the jail their protests of arrests of other protesting students the day before, and perhaps to protest more generally against state and local policies and practices of racial segregation, including segregation of the jail. The county sheriff, legal custodian of the jail and jail grounds, tried to persuade the students to leave the jail grounds. When this did not work, he notified them that they must leave, that if they did not leave he would arrest them for trespassing, and that if they resisted he would charge them with that as well. Some of the students left but others, including petitioners, remained and they were arrested. On appeal the convictions were affirmed by the Florida Circuit Court and then by the Florida District Court of Appeal, 175 So. 2d 249. That being the highest state court to which they could appeal, petitioners applied to us for certiorari

---

[1] "Every trespass upon the property of another, committed with a malicious and mischievous intent, the punishment of which is not specially provided for, shall be punished by imprisonment not exceeding three months, or by fine not exceeding one hundred ·dollars." Fla. Stat. § 821.18 (1965).

contending that, in view of petitioners' purpose to protest against jail and other segregation policies, their conviction denied them "rights of free speech, assembly, petition, due process of law and equal protection of the laws as guaranteed by the Fourteenth Amendment to the Constitution of the United States." On this "Question Presented" we granted certiorari. 382 U. S. 1023. Petitioners present their argument on this question in four separate points, and for convenience we deal with each of their points in the order in which they present them.

## I.

Petitioners have insisted from the beginning of this case that it is controlled by and must be reversed because of our prior cases of *Edwards* v. *South Carolina,* 372 U. S. 229, and *Cox* v. *Louisiana,* 379 U. S. 536, 559. We cannot agree.

The *Edwards* case, like this one, did come up when a number of persons demonstrated on public property against their State's segregation policies. They also sang hymns and danced, as did the demonstrators in this case. But here the analogies to this case end. In *Edwards,* the demonstrators went to the South Carolina State Capitol grounds to protest. In this case they went to the jail. Traditionally, state capitol grounds are open to the public. Jails, built for security purposes, are not. The demonstrators at the South Carolina Capitol went in through a public driveway and as they entered they were told by state officials there that they had a right as citizens to go through the State House grounds as long as they were peaceful. Here the demonstrators entered the jail grounds through a driveway used only for jail purposes and without warning to or permission from the sheriff. More importantly, South Carolina sought to prosecute its State Capitol demonstrators by charging them with the common-law crime of breach of the peace.

42

This Court in *Edwards* took pains to point out at length the indefinite, loose, and broad nature of this charge; indeed, this Court pointed out at p. 237, that the South Carolina Supreme Court had itself declared that the "breach of the peace" charge is "not susceptible of exact definition." South Carolina's power to prosecute, it was emphasized at p. 236, would have been different had the State proceeded under a "precise and narrowly drawn regulatory statute evincing a legislative judgment that certain specific conduct be limited or proscribed" such as, for example, "limiting the periods during which the State House grounds were open to the public . . . ." The South Carolina breach-of-the-peace statute was thus struck down as being so broad and all-embracing as to jeopardize speech, press, assembly and petition, under the constitutional doctrine enunciated in *Cantwell* v. *Connecticut,* 310 U. S. 296, 307–308, and followed in many subsequent cases. And it was on this same ground of vagueness that in *Cox* v. *Louisiana, supra,* at 551–552, the Louisiana breach-of-the-peace law used to prosecute Cox was invalidated.

The Florida trespass statute under which these petitioners were charged cannot be challenged on this ground. It is aimed at conduct of one limited kind, that is, for one person or persons to trespass upon the property of another with a malicious and mischievous intent. There is no lack of notice in this law, nothing to entrap or fool the unwary.

Petitioners seem to argue that the Florida trespass law is void for vagueness because it requires a trespass to be "with a malicious and mischievous intent . . . ." But these words do not broaden the scope of trespass so as to make it cover a multitude of types of conduct as does the common-law breach-of-the-peace charge. On the contrary, these words narrow the scope of the offense.

The trial court charged the jury as to their meaning and petitioners have not argued that this definition, set out below,[2] is not a reasonable and clear definition of the terms. The use of these terms in the statute, instead of contributing to uncertainty and misunderstanding, actually makes its meaning more understandable and clear.

## II.

Petitioners in this Court invoke the doctrine of abatement announced by this Court in *Hamm* v. *City of Rock Hill*, 379 U. S. 306. But that holding was that the Civil Rights Act of 1964, 78 Stat. 241, which made it unlawful for places of public accommodation to deny service to any person because of race, effected an abatement of prosecutions of persons for seeking such services that arose prior to the passage of the Act. But this case in no way involves prosecution of petitioners for seeking service in establishments covered by the Act. It involves only an alleged trespass on jail grounds—a trespass which can be prosecuted regardless of the fact that it is the means of protesting segregation of establishments covered by the Act.

---

[2] " 'Malicious' means wrongful, you remember back in the original charge, the State has to prove beyond a reasonable doubt there was a malicious and mischievous intent. The word 'malicious' means that the wrongful act shall be done voluntarily, unlawfully and without excuse or justification. The word 'malicious' that is used in these affidavits does not necessarily allege nor require the State to prove that the defendant had actual malice in his mind at the time of the alleged trespass. Another way of stating the definition of 'malicious' is by 'malicious' is meant the act was done knowingly and willfully and without any legal justification.

" 'Mischievous,' which is also required, means that the alleged trespass shall be inclined to cause petty and trivial trouble, annoyance and vexation to others in order for you to find that the alleged trespass was committed with mischievous intent." R. 74.

## III.

Petitioners next argue that "petty criminal statutes may not be used to violate minorities' constitutional rights." This of course is true but this abstract proposition gets us nowhere in deciding this case.

## IV.

Petitioners here contend that "Petitioners' convictions are based on a total lack of relevant evidence." If true, this would be a denial of due process under *Garner* v. *Louisiana,* 368 U. S. 157, and *Thompson* v. *City of Louisville,* 362 U. S. 199. Both in the petition for certiorari and in the brief on the merits petitioners state that their summary of the evidence "does not conflict with the facts contained in the Circuit Court's opinion" which was in effect affirmed by the District Court of Appeal. 175 So. 2d 249. That statement is correct and petitioners' summary of facts, as well as that of the Circuit Court, shows an abundance of facts to support the jury's verdict of guilty in this case.

In summary both these statements show testimony ample to prove this: Disturbed and upset by the arrest of their schoolmates the day before, a large number of Florida A. & M. students assembled on the school grounds and decided to march down to the county jail. Some apparently wanted to be put in jail too, along with the students already there.[3] A group of around 200 marched

---

[3] The three petitioners who testified insisted that they had not come to the jail for the purpose of being arrested. But both the sheriff and a deputy testified that they heard several of the demonstrators present at the jail loudly proclaim their desire to be arrested. Indeed, this latter version is borne out by the fact that, though assertedly protesting the prior arrests of their fellow students and the city's segregation policies, none of the demonstrators carried any signs and upon arriving at the jail, no speeches or other verbal protests were made.

from the school and arrived at the jail singing and clapping.[4] They went directly to the jail-door entrance where they were met by a deputy sheriff, evidently surprised by their arrival. He asked them to move back, claiming they were blocking the entrance to the jail and fearing that they might attempt to enter the jail. They moved back part of the way, where they stood or sat, singing, clapping and dancing, on the jail driveway and on an adjacent grassy area upon the jail premises. This particular jail entrance and driveway were not normally used by the public, but by the sheriff's department for transporting prisoners to and from the courts several blocks away and by commercial concerns for servicing the jail. Even after their partial retreat, the demonstrators continued to block vehicular passage over this driveway up to the entrance of the jail.[5] Someone called the sheriff who was at the moment apparently conferring with one of the state court judges about incidents connected with prior arrests for demonstrations. When the sheriff returned to the jail, he immediately inquired if all was safe inside the jail and was told it was. He then engaged in a conversation with two of the

---

[4] There is no evidence that any attempt was made by law enforcement officers to interfere with this march, or, for that matter, that such officers even knew of the march or its ultimate destination.

[5] Although some of the petitioners testified that they had no intention of interfering with vehicular traffic to and from the jail entrance and that they noticed no vehicle trying to enter or leave the driveway, the deputy sheriff testified that it would have been impossible for automobiles to drive up to the jail entrance and that one serviceman, finished with his business in the jail, waited inside because the demonstrators were sitting around and leaning against his truck parked outside. The sheriff testified that the time the demonstrators were there, between 9:30 and 10 Monday morning, was generally a very busy time for using the jail entrance to transport weekend inmates to the courts and for tradesmen to make service calls at the jail.

leaders. He told them that they were trespassing upon jail property and that he would give them 10 minutes to leave or he would arrest them. Neither of the leaders did anything to disperse the crowd, and one of them told the sheriff that they wanted to get arrested. A local minister talked with some of the demonstrators and told them not to enter the jail, because they could not arrest themselves, but just to remain where they were. After about 10 minutes, the sheriff, in a voice loud enough to be heard by all, told the demonstrators that he was the legal custodian of the jail and its premises, that they were trespassing on county property in violation of the law, that they should all leave forthwith or he would arrest them, and that if they attempted to resist arrest, he would charge them with that as a separate offense. Some of the group then left. Others, including all petitioners, did not leave. Some of them sat down. In a few minutes, realizing that the remaining demonstrators had no intention of leaving, the sheriff ordered his deputies to surround those remaining on jail premises and placed them, 107 demonstrators, under arrest. The sheriff unequivocally testified that he did not arrest any persons other than those who were on the jail premises. Of the three petitioners testifying, two insisted that they were arrested before they had a chance to leave, had they wanted to, and one testified that she did not intend to leave. The sheriff again explicitly testified that he did not arrest any person who was attempting to leave.

Under the foregoing testimony the jury was authorized to find that the State had proven every essential element of the crime, as it was defined by the state court. That interpretation is, of course, binding on us, leaving only the question of whether conviction of the state offense, thus defined, unconstitutionally deprives petitioners of their rights to freedom of speech, press, assembly or petition. We hold it does not. The sheriff, as jail custodian,

had power, as the state courts have here held, to direct that this large crowd of people get off the grounds. There is not a shred of evidence in this record that this power was exercised, or that its exercise was sanctioned by the lower courts, because the sheriff objected to what was being sung or said by the demonstrators or because he disagreed with the objectives of their protest. The record reveals that he objected only to their presence on that part of the jail grounds reserved for jail uses. There is no evidence at all that on any other occasion had similarly large groups of the public been permitted to gather on this portion of the jail grounds for any purpose.[6] Nothing in the Constitution of the United States prevents Florida from even-handed enforcement of its general trespass statute against those refusing to obey the sheriff's order to remove themselves from what amounted to the curtilage of the jailhouse. The State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated. For this reason there is no merit to the petitioners' argument that they had a constitutional right to stay on the property, over the jail custodian's objections, because this "area chosen for the peaceful civil rights demonstration was not only 'reasonable' but also particularly appropriate . . . ." Such an argument has as its major unarticulated premise the assumption

---

[6] In *Cox* v. *Louisiana, supra,* at 558, the Court emphasized: "It is, of course, undisputed that appropriate, limited discretion, under properly drawn statutes or ordinances, concerning the time, place, duration, or manner of use of the streets for public assemblies may be vested in administrative officials, provided that such limited discretion is 'exercised with "uniformity of method of treatment upon the facts of each application, free from improper or inappropriate considerations and from unfair discrimination" . . . [and with] a "systematic, consistent and just order of treatment, with reference to the convenience of public use of the highways . . . ." ' "

that people who want to propagandize protests or views have a constitutional right to do so whenever and however and wherever they please. That concept of constitutional law was vigorously and forthrightly rejected in two of the cases petitioners rely on, *Cox* v. *Louisiana, supra,* at 554–555 and 563–564.[7] We reject it again. The United States Constitution does not forbid a State to control the use of its own property for its own lawful nondiscriminatory purpose.

These judgments are　　　　　　　　　　　　　　*Affirmed.*

MR. JUSTICE DOUGLAS, with whom THE CHIEF JUSTICE, MR. JUSTICE BRENNAN, and MR. JUSTICE FORTAS concur, dissenting.

The First Amendment, applicable to the States by reason of the Fourteenth (*Edwards* v. *South Carolina,* 372 U. S. 229, 235), provides that "Congress shall make no law . `. . abridging . . . the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." These rights, along with religion, speech, and press, are preferred rights of the Constitution, made so by reason of that explicit guarantee and

---

[7] "The rights of free speech and assembly, while fundamental in our democratic society, still do not mean that everyone with opinions or beliefs to express may address a group at any public place and at any time. The constitutional guarantee of liberty implies the existence of an organized society maintaining public order, without which liberty itself would be lost in the excesses of anarchy. . . . A group of demonstrators could not insist upon the right to cordon off a street, or entrance to a public or private building, and allow no one to pass who did not agree to listen to their exhortations." 379 U. S., at 554–555.

"The conduct which is the subject of this statute—picketing and parading—is subject to regulation even though intertwined with expression and association. The examples are many of the application by this Court of the principle that certain forms of conduct mixed with speech may be regulated or prohibited." *Id.,* at 563.

what Edmond Cahn in Confronting Injustice (1966) referred to as "The Firstness of the First Amendment." [1] With all respect, therefore, the Court errs in treating the case as if it were an ordinary trespass case or an ordinary picketing case.

The jailhouse, like an executive mansion, a legislative chamber, a courthouse, or the statehouse itself (*Edwards v. South Carolina, supra*) is one of the seats of government, whether it be the Tower of London, the Bastille, or a small county jail. And when it houses political prisoners or those who many think are unjustly held, it is an obvious center for protest. The right to petition for the redress of grievances has an ancient history [2] and

---

[1] "Where would we really find the principal danger to civil liberty in a republic? Not in the governors as governors, not in the governed as governed, but in the governed unequipped to function as governors. The chief enemies of republican freedom are mental sloth, conformity, bigotry, superstition, credulity, monopoly in the market of ideas, and utter, benighted ignorance. Relying as it does on the consent of the governed, representative government cannot succeed unless the community receives enough information to grasp public issues and make sensible decisions. As lights which may have been enough for the past do not meet the needs of the present, so present lights will not suffice for the more extensive and complex problems of the future. Heretofore public enlightenment may have been only a manifest desideratum; today it constitutes an imperative necessity. The First Amendment, says Justice Black, 'reflects the faith that a good society is not static but advancing, and that the fullest possible interchange of ideas and beliefs is essential to attainment of this goal.' [From *Feldman* v. *United States*, 322 U. S. 487, 501 (dissenting opinion).]" Cahn, *supra*, at 102.

[2] The historical antecedents of the right to petition for the redress of grievances run deep, and strike to the heart of the democratic philosophy. C. 61 of the Magna Carta provided:

"[T]hat if we or our justiciar, or our bailiffs, or any of our servants shall have done wrong in any way toward any one, or shall have transgressed any of the articles of peace or security; and the wrong shall have been shown to four barons of the aforesaid twenty-five barons, let those four barons come to us or to our justiciar, if we

is not limited to writing a letter or sending a telegram to a congressman; it is not confined to appearing before the local city council, or writing letters to the President or Governor or Mayor. See *N. A. A. C. P.* v. *Button,* 371 U. S. 415, 429–431. Conventional methods of petitioning may be, and often have been, shut off to large groups of our citizens. Legislators may turn deaf ears; formal complaints may be routed endlessly through a bureaucratic maze; courts may let the wheels of justice grind very slowly. Those who do not control television

---

are out of the kingdom, laying before us the transgression, and let them ask that we cause that transgression to be corrected without delay." Sources of Our Liberties 21 (Perry ed. 1959).

The representatives of the people vigorously exercised the right in order to gain the initiative in legislation and a voice in their government. See Pollard, The Evolution of Parliament 329–331 (1964). By 1669 the House of Commons had resolved that "it is an inherent right of every commoner of England to prepare and present Petitions to the house of commons in case of grievance," and "That no court whatsoever hath power to judge or censure any Petition presented . . . ." 4 Parl. Hist. Eng. 432–433 (1669). The Bill of Rights of 1689 provided "That it is the right of the subjects to petition the king and all commitments and prosecutions for such petitioning are illegal." Adams & Stephens, Select Documents of English Constitutional History 464. The right to petition for a redress of grievances was early asserted in the Colonies. The Stamp Act Congress of 1765 declared "That it is the right of the British subjects in these colonies, to petition the king or either house of parliament." Sources of Our Liberties 271 (Perry ed. 1959). The Declaration and Resolves of the First Continental Congress, adopted October 14, 1774, declared that Americans "have a right peaceably to assemble, consider their grievances, and petition the king; and that all prosecutions, prohibitory proclamations, and commitments for the same, are illegal." *Id.,* at 288. The Declaration of Independence assigned as one of the reasons for the break from England the fact that "Our repeated Petitions have been answered only by repeated injury." The constitutions of four of the original States specifically guaranteed the right. Mass. Const., Art. 19 (1780); Pa. Const., Art. IX, § 20 (1790); N. H. Const., Art. 32 (1784); N. C. Const., Art. 18 (1776).

and radio, those who cannot afford to advertise in newspapers or circulate elaborate pamphlets may have only a more limited type of access to public officials. Their methods should not be condemned as tactics of obstruction and harassment as long as the assembly and petition are peaceable, as these were.

There is no question that petitioners had as their purpose a protest against the arrest of Florida A. & M. students for trying to integrate public theatres. The sheriff's testimony indicates that he well understood the purpose of the rally. The petitioners who testified unequivocally stated that the group was protesting the arrests, and state and local policies of segregation, including segregation of the jail. This testimony was not contradicted or even questioned. The fact that no one gave a formal speech, that no elaborate handbills were distributed, and that the group was not laden with signs would seem to be immaterial. Such methods are not the *sine qua non* of petitioning for the redress of grievances. The group did sing "freedom" songs. And history shows that a song can be a powerful tool of protest. See *Cox v. Louisiana,* 379 U. S. 536, 546–548. There was no violence; no threat of violence; no attempted jail break; no storming of a prison; no plan or plot to do anything but protest. The evidence is uncontradicted that the petitioners' conduct did not upset the jailhouse routine; things went on as they normally would. None of the group entered the jail. Indeed, they moved back from the entrance as they were instructed. There was no shoving, no pushing, no disorder or threat of riot. It is said that some of the group blocked part of the driveway leading to the jail entrance. The chief jailer, to be sure, testified that vehicles would not have been able to use the driveway. Never did the students locate themselves so as to cause interference with persons or vehicles going to or coming from the jail. Indeed, it is undisputed that the sheriff and deputy sheriff, in

separate cars, were able to drive up the driveway to the parking places near the entrance and that no one obstructed their path. Further, it is undisputed that the entrance to the jail was not blocked. And whenever the students were requested to move they did so. If there was congestion, the solution was a further request to move to lawns or parking areas, not complete ejection and arrest. The claim is made that a tradesman waited inside the jail because some of the protestants were sitting around and leaning on his truck. The only evidence supporting such a conclusion is the testimony of a deputy sheriff that the tradesman "came to the door . . . and then did not leave." His remaining is just as consistent with a desire to satisfy his curiosity as it is with a restraint. Finally, the fact that some of the protestants may have felt their cause so just that they were willing to be arrested for making their protest outside the jail seems wholly irrelevant. A petition is nonetheless a petition, though its futility may make martyrdom attractive.

We do violence to the First Amendment when we permit this "petition for redress of grievances" to be turned into a trespass action. It does not help to analogize this problem to the problem of picketing. Picketing is a form of protest usually directed against private interests. I do not see how rules governing picketing in general are relevant to this express constitutional right to assemble and to petition for redress of grievances. In the first place the jailhouse grounds were not marked with "NO TRESPASSING!" signs, nor does respondent claim that the public was generally excluded from the grounds. Only the sheriff's fiat transformed lawful conduct into an unlawful trespass. To say that a private owner could have done the same if the rally had taken place on private property is to speak of a different case, as an assembly and a petition for redress of grievances run to government, not to private proprietors.

The Court forgets that prior to this day our decisions have drastically limited the application of state statutes inhibiting the right to go peacefully on public property to exercise First Amendment rights. As Mr. Justice Roberts wrote in *Hague* v. *C. I. O.*, 307 U. S. 496, 515–516:

". . . Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens. The privilege of a citizen of the United States to use the streets and parks for communication of views on national questions may be regulated in the interest of all; it is not absolute, but relative, and must be exercised in subordination to the general comfort and convenience, and in consonance with peace and good order; but it must not, in the guise of regulation, be abridged or denied."

Such was the case of *Edwards* v. *South Carolina,* where aggrieved people "peaceably assembled at the site of the State Government" to express their grievances to the citizens of the State as well as to the legislature. *Supra,* at 235. *Edwards* was in the tradition of *Cox* v. *New Hampshire,* 312 U. S. 569, where the public streets were said to be "immemorially associated" with "the right of assembly and the opportunities for the communication of thought and the discussion of public questions." *Id.,* at 574. When we allow Florida to construe her "malicious trespass" statute to bar a person from going on property knowing it is not his own and to apply that prohibition to public property, we discard *Cox* and *Edwards.* Would the case be any different if, as is common, the demonstration took place outside a building which housed both the jail and the legislative body? I think not.

There may be some public places which are so clearly committed to other purposes that their use for the airing of grievances is anomalous. There may be some instances in which assemblies and petitions for redress of grievances are not consistent with other necessary purposes of public property. A noisy meeting may be out of keeping with the serenity of the statehouse or the quiet of the courthouse. No one, for example, would suggest that the Senate gallery is the proper place for a vociferous protest rally. And in other cases it may be necessary to adjust the right to petition for redress of grievances to the other interests inhering in the uses to which the public property is normally put. See *Cox* v. *New Hampshire, supra; Poulos* v. *New Hampshire,* 345 U. S. 395. But this is quite different from saying that all public places are off limits to people with grievances. See *Hague* v. *C. I. O., supra; Cox* v. *New Hampshire, supra; Jamison* v. *Texas,* 318 U. S. 413, 415–416; *Edwards* v. *South Carolina, supra.* And it is farther yet from saying that the "custodian" of the public property in his discretion can decide when public places shall be used for the communication of ideas, especially the constitutional right to assemble and petition for redress of grievances. See *Hague* v. *C. I. O., supra; Schneider* v. *State,* 308 U. S. 147, 163–164; *Cantwell* v. *Connecticut,* 310 U. S. 296; *Largent* v. *Texas,* 318 U. S. 418; *Niemotko* v. *Maryland,* 340 U. S. 268; *Shuttlesworth* v. *City of Birmingham,* 382 U. S. 87. For to place such discretion in any public official, be he the "custodian" of the public property or the local police commissioner (cf. *Kunz* v. *New York,* 340 U. S. 290), is to place those who assert their First Amendment rights at his mercy. It gives him the awesome power to decide whose ideas may be expressed and who shall be denied a place to air their claims and petition their government. Such power is out of step with all our decisions prior to

today where we have insisted that before a First Amendment right may be curtailed under the guise of a criminal law, any evil that may be collateral to the exercise of the right, must be isolated and defined in a "narrowly drawn" statute (*Cantwell* v. *Connecticut, supra,* at 307) lest the power to control excesses of conduct be used to suppress the constitutional right itself. See *Stromberg* v. *California,* 283 U. S. 359, 369; *Herndon* v. *Lowry,* 301 U. S. 242, 258–259; *Edwards* v. *South Carolina, supra,* at 238; *N. A. A. C. P.* v. *Button, supra,* at 433.

That tragic consequence happens today when a trespass law is used to bludgeon those who peacefully exercise a First Amendment right to protest to government against one of the most grievous of all modern oppressions which some of our States are inflicting on our citizens.

What we do today disregards the admonition in *De Jonge* v. *Oregon,* 299 U. S. 353, 364–365:

> "These [First Amendment] rights may be abused by using speech or press or assembly in order to incite to violence and crime. The people through their legislatures may protect themselves against that abuse. But the legislative intervention can find constitutional justification only by dealing with the abuse. The rights themselves must not be curtailed. The greater the importance of safeguarding the community from incitements to the overthrow of our institutions by force and violence, the more imperative is the need to preserve inviolate the constitutional rights of free speech, free press and free assembly in order to maintain the opportunity for free political discussion, to the end that government may be responsive to the will of the people and that changes, if desired, may be obtained by peaceful means. Therein lies the security of the Republic, the very foundation of constitutional government."

56

Today a trespass law is used to penalize people for exercising a constitutional right. Tomorrow a disorderly conduct statute, a breach-of-the-peace statute, a vagrancy statute will be put to the same end.[3] It is said that the sheriff did not make the arrests because of the views which petitioners espoused. That excuse is usually given, as we know from the many cases involving arrests of minority groups for breaches of the peace, unlawful assemblies, and parading without a permit. The charge against William Penn, who preached a nonconformist doctrine in a street in London, was that he caused "a great concourse and tumult of people" in contempt of the King and "to the great disturbance of his peace." 6 How. St. Tr. 951, 955. That was in 1670. In modern times, also, such arrests are usually sought to be justified by some legitimate function of government.[4] Yet by allowing these orderly and civilized protests against injustice to be suppressed, we only increase the forces of frustration which the conditions of second-class citizenship are generating amongst us.

---

[3] In 1932 over 28,000 veterans demanding a bonus marched on Washington, D. C., paraded the streets, and camped mostly in parks and other public lands in the District, Virginia, and Maryland only to be routed by the Army. See Waters, B. E. F. (1933).

[4] See, e. g., De Jonge v. Oregon, 299 U. S. 353; Feiner v. New York, 340 U. S. 315; Niemotko v. Maryland, 340 U. S. 268; Edwards v. South Carolina, 372 U. S. 229; Cox v. Louisiana, 379 U. S. 536; Shuttlesworth v. City of Birmingham, 382 U. S. 87. The same is true of other measures which inhibit First Amendment rights. See, e. g., N. A. A. C. P. v. Alabama, 357 U. S. 449; Bates v. City of Little Rock, 361 U. S. 516; Shelton v. Tucker, 364 U. S. 479; N. A. A. C. P. v. Button, 371 U. S. 415. If the invalidity of regulations and official conduct curtailing First Amendment rights turned on an unequivocal showing that the measure was intended to inhibit the rights, protection would be sorely lacking. It is not the intent or purpose of the measure but its effect on First Amendment rights which is crucial.