STATE v. CURTIS QUINNELL.

151 N. W. (2d) 598.

June 9, 1967—No. 39,818.

*Bentson & Kalina,* for appellant.

*Douglas M. Head,* Attorney General, and *Roger Miller,* City Attorney, South St. Paul, for respondent.

PETERSON, JUSTICE.

Defendant appeals from a district court judgment[1] convicting him of criminal trespass, a misdemeanor.[2] The sole issue for decision is one of jurisdiction over the person of the defendant[3]—whether under the

---

[1] Defendant was first tried in the municipal court of South St. Paul, by a jury, which returned a verdict of guilty. Upon appeal to the District Court of Dakota County he was tried de novo, by the judge without a jury, and was again adjudged guilty.

[2] Minn. St. 609.605 provides in part: "Whoever intentionally does any of the following may be sentenced to imprisonment for not more than 90 days or to payment of a fine of not more than $100:

\* \* \* \* \*

"(5) Trespasses upon the premises of another and, without claim of right, refuses to depart therefrom on demand of the lawful possessor thereof."

[3] Defendant argues, also, that the evidence was insufficient to sustain his conviction. The same questions of evidence are essentially asked and answered

evidence the arrest of defendant for a misdemeanor and without a warrant was valid, it being defendant's contention that no offense was committed or attempted in the presence of the arresting officer.

Defendant's arrest and conviction arose out of his participation in an organized "demonstration" of livestock farmers on September 24, 1964, upon the premises of the St. Paul Union Stockyards Company (hereafter referred to as "Stockyards"), protesting existing methods of marketing livestock. Stockyards is engaged in the business of providing facilities and services incident to the selling and buying of livestock upon property owned by it in South St. Paul, Minnesota. Its private properties are traversed by various roadways which are also its private property and are so marked by signs. The roadways give access to the various interior pen structures, called "chutes," one of which roadways is called East Chute Road. The chutes are variously used for unloading and holding hogs, sheep, and cattle, and are assigned by Stockyards to various commission firms as Stockyards in its sole discretion determines. The hog unloading chutes, most directly involved here, and located directly west of the East Chute Road, however, were not assigned to any firm but were in the exclusive possession and control of Stockyards. Ordinarily, visitors and anyone who has business at the stockyards are permitted to enter upon its premises for such purpose.

On the morning of September 24, 1964, a large group of individuals, with farm trucks and other vehicles,[4] gathered at the stockyards for purposes of a demonstration. The apparent general objective of the demonstration was to promote changes in established marketing methods, making the sale of livestock *before* unloading the animals into the

---

with respect to the jurisdictional issue; any other evidentiary claims are utterly devoid of merit.

[4] The state estimated the number of persons as from 300 to 400; defendant at oral argument acknowledged that the number of persons was approximately 300. The number of trucks in the area is not known, but the testimony indicates that approximately 20 pickup trucks were "nosed into" the hog unloading chutes, blocking 10 of them, and numerous others were lined up on East Chute Road. The state on oral argument estimated there were approximately 200 trucks.

chutes or holding pens.[5] The immediate objective of the demonstration, more specifically stated, was physically to prevent the unloading of hogs into the chutes. The first trucks congregated at the hog chutes and were so parked that the *front* of the trucks faced against the loading docks. Some of the trucks of the demonstrators may have had animals in them, but otherwise their trucks were empty. Under the circumstances, however, it would have been physically impossible for the trucks of demonstrators or nondemonstrators to have been unloaded at the hog chutes. There were so many persons and vehicles, moreover, that other trucks were spread out and obstructed the sheep and cattle holding pens and access roadways as well.

The effect of this activity was such that by 11:30 a. m. the hog unloading and other stockyard operations were at a complete halt.[6] At about 11:55 Joel Bennett, a Stockyards' vice president, talked to the crowd over a loudspeaker mounted on a police vehicle[7] on East Chute Road. He stated his name and his position with Stockyards, told the demonstrators that they were on private property, and asked them to clear the area because Stockyards was unable to conduct its business. He warned the demonstrators that if they did not clear the area within 15 minutes he would ask for police assistance, but the crowd did not disperse. Robert L. Ketcham, the South St. Paul police chief, thereafter made an announcement over the loudspeaker at about 12:15. He identified himself and asked the demonstrators to leave, but the crowd still

---

[5] No issue is presented as to whether this was an organized demonstration or, more particularly, as to who were the organizers of the demonstration, for defendant's own conduct constituting trespass is no less an offense in either case. Defendant's counsel did state in oral argument that it was "more or less a demonstration" and that "apparently somebody had planned on it." No issue exists, of course, as to the merits of the controversy itself. It is fundamental that no person or association, however laudable or lawful its objectives, has a right to achieve such objective by unlawful means.

[6] Defendant acknowledges at least that some persons had their vehicles parked "near the unloading chutes in such a manner that the stock yards could not function normally."

[7] Police officers from both South St. Paul and Dakota County were on duty on the premises at that time.

did not disperse. Thereupon, at about 12:30, Chief Ketcham instructed his police officers to tell the demonstrators to move and if they did not do so to arrest them for trespassing.

Defendant, Curtis Quinnell, was one of seven persons thereafter arrested. Quinnell was once a hog raiser himself, but he had not raised hogs since 1962 and was at the time of arrest a grain farmer and milk hauler. He had, in fact, been hauling milk that morning and, after having completed one trip to the creamery, had set out to pick up milk at five other farms, the first of which was the farm of a Mrs. O'Rourke. On his way to her farm, he had heard a radio broadcast concerning the disturbance at the stockyards. He knew that his brother was among the demonstrators there, so after he was loaded he left his partially filled milk truck and came to the stockyards with Mrs. O'Rourke in her automobile to see what was going on and, in his words, to "see if they was getting any place." While Mrs. O'Rourke parked the car somewhere, defendant walked down East Chute Road over to the crowd by the hog unloading chutes. The exact time of his arrival is not certain. An acquaintance of defendant testified that defendant arrived at about 12:30 p. m., which would have been *after* the announcements to the crowd by Bennett and Ketcham.[8] Captain Arne Jensen of the South St. Paul Police Department testified that he saw defendant in the crowd about the time of the public announcements. In our view of the case, however, the exact time of his arrival is not of crucial significance.

Captain Jensen approached Quinnell at about 12:30 p. m., told him that he was trespassing, and directed him to leave. He did not leave. Defendant said nothing in reply but just "walked a little bit back and forth." After waiting about 3 minutes, Captain Jensen placed him under arrest.

Defendant's conviction of trespass must be sustained on either of two principles: (1) Defendant was a trespasser from the moment of

---

[8] Defendant testified that his time of arrival was about 11:25 a.m., which would be *before* the announcements, but his counsel by a leading question corrected him, stating that he believed it was "an obvious error." He also testified that upon his arrival he observed one of the demonstrators being arrested. Mrs. O'Rourke did not testify.

his entry upon the premises on that day because, under the circumstances of this case, he had no right to be there present, irrespective of whether or not he was present to hear personally the announcement of Stockyards' official, Bennett, or that of Chief Ketcham; or (2) even assuming he had a right by implied license to be on the premises initially, such license was duly revoked before his arrest and this was adequately communicated to him by the arresting officer.

■ Defendant was, in the circumstances of this case, a trespasser from the moment he entered upon the premises. Stockyards' consent to the public to enter upon its premises for public relations tours or business purposes constitutes a license to the public *for those purposes.* 53 C. J. S., Licenses, § 84. Whatever may be the implied license to enter upon the premises of another for purposes of ordinary business intercourse with the landowner, commonsense dictates there can be no implied license to enter upon the premises of another to engage in extraordinary activity *hostile* to the business of the owner. Defendant acknowledged at oral argument that he "does not claim he was there on a specific business purpose," and the evidence establishes beyond doubt the irrelevance of his purpose. He was there only as a meddler who had abandoned his own normal activity to participate in the abnormal activity of an organized mass demonstration instigated by others. Where a person deliberately joins and remains with a crowd engaging in unlawful activity, the inference is inescapable that such person is there for the same unlawful purpose.

■ Even assuming that defendant's original entry upon the premises was pursuant to an implied license, such license was affirmatively revoked by Stockyards.[9] If, as the trial court could have found contrary to defendant's claim, Quinnell was in fact present and heard Bennett ask the demonstrators to leave, there could be no question whatever that he was guilty of trespass.[10]

The more critical question posed by defendant, assuming that he did not himself hear Bennett's announcement that the demonstrators

[9] It is elementary that such license is revocable at the will of the owner. State, by Attorney General, v. Riley, 213 Minn. 448, 7 N. W. (2d) 770.

[10] See, Mitchell v. Mitchell, 54 Minn. 301, 55 N. W. 1134.

were trespassers and must quit the premises, is whether the same instructions from either Chief Ketcham or Captain Jensen were authorized notice and demand from the landowner. The thrust of defendant's argument is the technical claim that a police officer during duty hours cannot be the agent of a private landowner for the purpose of conveying such revocation or demand. We think it is, at best, an ad hoc claim to exculpate him from the consequences of his own mistaken militancy. We are not at all persuaded that we must thus reject the dictates of commonsense. The term "agent" is one of wide signification. It is not a question of actual agency in the technical sense of making one person, as principal, responsible for the actions of another person, as agent; nor is it in this case a question of a public official performing an act incompatible with his public employment. It is simply a case, if any bona fide doubt existed in defendant's mind, of the police officer being a credible vehicle for conveying to defendant the information that Stockyards did not want him on the premises. With a crowd of several hundred people congesting and blocking Stockyards' operation, it was only reasonable that it should request police assistance, in its behalf, to direct persons to leave the area. This was, in our view, a sufficient "demand of the lawful possessor" of Stockyards within the meaning of the trespass statute.

A somewhat similar defense was rejected in Whittlesey v. United States (App. D. C.) 221 A. (2d) 86, where a group of persons conducted a "sit-in" in the White House and refused to leave when requested by the commanding officer of the White House Police. Defendants there argued that the President of the United States, as the possessor of the White House, was the *only* person who could order them to leave, which argument the court peremptorily rejected (221 A. [2d] 92):

"* * * Actually the case is a simple one. A group of apparently intelligent people deliberately violated the law, defied legal authority and invited arrest. After a fair trial they were found guilty. They seek to avoid their convictions by a series of technical arguments, none of which have substantive merit."

Defendant's contrary citation of Templin v. State, 159 Ala. 128, 48 So. 1027, is not persuasively in point. Defendant there was traveling on a road leading from the main public road to the post office, commissary, and houses occupied by employees of the owner of the premises for the normal purpose of making delivery of food to employees who were his customers. A police officer, who was also an employee of the company but who the court apparently found was at that time acting in his capacity as a police officer, warned defendant that he was a trespasser and ordered him to leave at once. The court's rationale is obscure but its decision seemingly turned on circumstances obviously distinguishable from the facts in the instant case (159 Ala. 133, 48 So. 1029):

"* * * Here is a man traveling upon the highway [pursuing his legitimate and lawful business], when he is suddenly hailed and halted, and told by another he is a trespasser—a law breaker—and peremptorily ordered to then and there turn his wagon around and leave the road. He refuses so to do, until he can proceed a few yards and deliver some food and vegetables to customers who had ordered same—promising to thereupon leave at the bidding of this lawmaker and executioner; but this small request is denied the citizen, and he is then and there arrested, deprived of his liberty, and carried before a magistrate, and this lawmaker and executioner swears he has committed two offenses."

If this decision may be thought to announce principles of law contrary to the views expressed in this opinion, we decline to follow it.

Defendant seems also to argue that, because a large part of the stockyards were leased to independent commission firms, the demonstrators were implied licensees of those commission firms, and Stockyards was therefore without power to revoke the license, citing Commonwealth v. Richardson, 313 Mass. 632, 48 N. E. (2d) 678, 146 A. L. R. 648, in support of their contention. To state the facts, however, is to distinguish the cases at once. The Richardson trespass complaints arose out of the demand of an apartment-building landlord that Jehovah's Witnesses refrain from entering upon the premises for the

purpose of making peaceful communication with his apartment tenants. It is undisputed, in contrast, that neither the hog chutes nor the East Chute Road giving access thereto was owned or possessed by the commission firms but by Stockyards only, so that no rights of tenants were here involved. Even were this not so, the physical obstructing of the stockyards, for the apparent purpose of compelling a change in its marketing methods, would seem to be equally hostile to the commission firms and would equally negative any notion of implied consent. Whatever might be the presumption that a Jehovah's Witness might be welcome to the homes of the landlord's tenants for the purpose of peaceful and personal evangelism, any assumption that defendant and his fellow demonstrators, and the purposes for which they came, would be welcome at the stockyards on that day would strain the credulity of this court as much as it did that of the trial court.[11]

Although defendant does not make the point, we would add that nothing in the evidence suggests that his offense was the product of inadvertance or unwariness. He intentionally occupied the premises of Stockyards. without any circumstances indicative of innocent purposes. His defiance of the police officers, if nothing more, would characterize the nature of his original entry. He neither had a claim of right nor ever at the time asserted any claim of right to be there. The Advisory Committee Comment on the new Criminal Code, 40 M. S. A. p. 570, commenting on the statutory reference to trespass "without claim of right," observes that those words simply cover bona fide

---

[11] The other cases cited by defendant are similarly distinguishable on the facts or unpersuasive: Pennsylvania R. Co. v. Fucello, 91 N. J. L. 476, 103 A. 988, holding under a different statute that where the original entry was with the consent of the owner, subsequent refusal to leave does not relate back to make such entry a trespass ab initio; State v. Davis, 55 Utah 54, 184 P. 161, citing Fucello with approval in the dissent for the principle of strict construction of penal statutes; Marsh v. Alabama, 326 U. S. 501, 66 S. Ct. 276, 90 L. ed. 265, holding that peaceable distribution of religious literature on the sidewalk of a company town is an exercise of constitutionally protected free speech and peaceful assembly and not criminal trespass. Compare, more in point, Adderley v. Florida, 385 U. S. 39, 87 S. Ct. 242, 17 L. ed. (2d) 149.

claims of right and that "[a] false claim would not be a claim at all," language obviously relating to protection of an innocent trespasser from criminal prosecution.

A peace officer has the power to make an arrest without a warrant "[f]or a public offense committed or attempted in his presence." [12] Because the activity of defendant constituted criminal trespass, it follows that it was a public offense committed in the presence of the arresting officer. The district court, accordingly, had jurisdiction over the person of defendant and, upon this record, its judgment on the merits is sustained.

Affirmed.

---

[12] Minn. St. 629.34. See, also, State v. Duren, 266 Minn. 335, 123 N. W. (2d) 624; Hilla v. Jensen, 149 Minn. 58, 182 N. W. 902; State v. Pluth, 157 Minn. 145, 195 N. W. 789.