Audrea JONES et al., Appellants,

v.

DISTRICT OF COLUMBIA ARMORY
BOARD et al.

No. 24739.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 29, 1970.

Decided Nov. 2, 1970.

Mr. John T. Rigby, Washington, D. C., with whom Mr. Gerald M. Stern, Washington, D. C., was on the motion for appellants.

Mr. David P. Sutton, Asst. Corporation Counsel, Washington, D. C., with whom Mr. Richard W. Barton, Asst. Corporation Counsel, Washington, D. C., was on the opposition, for appellees.

Before MacKINNON, ROBB and WILKEY, Circuit Judges.

PER CURIAM:

Appellants have sought here an injunction (1) restraining the District of Columbia National Guard Armory Board from renting the Armory to any other parties during four 3-day periods in November and December, and (2) requir-

ing the Board to enter into negotiation with the appellant Jones and the Revolutionary Committee for A People's Constitution relating to the renting of the Armory.

Appellants allege that the refusal of the Board to rent the Armory for the requested dates was unconstitutional in two ways: First, as prior restraint on free speech and assembly; Second, as an unreasonable discrimination against the appellants amounting to a denial of equal protection of the laws. Finding no constitutional violation of appellants' rights in the action taken by the Board, we deny the requested injunction.

■ By Board resolution and letter of 12 October 1970 to counsel for appellants the Board denied the application of the appellants to rent the Armory, stating as reasons therefor: *First*, the Armory by statute is operated primarily to provide facilities for the National Guard;[1] *Second*, "that recent experience indicates that any convergence of numbers of people in the Nation's Capital for the purpose of fostering and/or furthering various causes is, unfortunately, attended with the possibility for the need of the National Guard's support of local authorities in the event of emergency"; and, *Third*, that "the renting of the Armory for the requested purpose could interfere with the Guard's ability to respond in accordance with its statutory duty."

■ In the District Court hearing, evidence of the "recent experience" of the Board and the Guard was introduced by way of an affidavit from the Commanding General of the Guard, who is also a member of the Board. There was a substantial showing that the use by any outside organization of any portion of the Armory at the time the Guard is called upon to act in maintaining public order would interfere with the functioning of the Guard.[2] It appears obvious that if the mobilization, operation, logistical support, and command direction of the D.C. Guard have been hampered by the use of the Armory at the same time by such organizations as the International Horse Show and the Rod and Custom (Auto) Show, then such Guard use would be even more hampered by the

[1]. 2 D.C.Code § 1701. *"Declaration of Policy.* It is hereby declared to be the policy of the Congress that the District of Columbia National Guard Armory shall be maintained and operated primarily to provide facilities for the quartering and training of the Militia of the District of Columbia, and, *secondarily* to provide suitable facilities for major athletic events, conventions, concerts, and such other activities as may be in the interest of the District of Columbia, * * *." (Emphasis added.)

This Act is subordinate to the general federal statute declaring the traditional military policy of the United States to be that the Army National Guard is "an integral part of the first line defense of the United States" and that it must be "maintained and *assured at all times.*" 32 U.S.C. § 102.

Other statutes of the District of Columbia further define the duties of the National Guard with respect to its Armament, Equipment and Supplies, D.C.Code § 39-501 et seq. These provide that their arms and equipment, insofar as practicable, are the same as furnished to the Regular Army, and that the Guard should be provided, *inter alia*, with such ordnance and other military stores as may be necessary for the proper performance of its statutory duties. § 39-501. An armory is required to be furnished, as "allowed and directed by the Commanding General" and such facilities "as may be necessary for the care, preservation, and safekeeping of the arms, equipment * * * and other militia property in their possession." § 39-514.

[2]. As two examples of several cited, the report on the Peace Demonstration and March of 21-23 October 1967 stated: Operations at the D. C. Armory were *hindered* due to preparations for the International Horse Show. * * * The lesson learned was that troop comfort, operations, messing and logistical support operations in support of deployed troops, over an extended period is hampered by limited use of Armory space. (Emphasis in the original.) Testimony showed that during the March for Victory sponsored by Dr. Carl McIntire, 4-5 April 1970, the Guard's activities were hampered by the Rod and Custom Show (automobiles) which occupied the drill floor during the period.

presence in the Armory of a group of 8,500 or more convention delegates, which group itself would be the center of attraction, the vortex of any civil disturbance which might occur.

This is not to say that the Revolutionary Committee for A People's Constitution delegates themselves would initiate any civil disturbance. Indeed, the very holding of a convention to draft a revised constitution is in itself an implicit acceptance of the rule of law and renunciation of extra-legal methods. But, as the District Court put it, "The argument is if the Black Panthers are here, there will be trouble in Washington; not that they won't be peaceful, but somebody else may not." Quite honestly on oral argument, counsel for appellants recognized that the authorities responsible for public order would mobilize the Guard as a precautionary measure when the Black Panthers and their allied organizations come to town to hold their constitutional convention, and that this would not be an unreasonable precaution, since the Black Panthers are a "controversial" organization.

Counsel for appellants also candidly agreed that the Armory building was in itself a unique building, in that it was the place at which the Guard stored its weapons and equipment, mobilized, and was organized and deployed for its mission. It is of course much more than the initial departure point for the Guard. It is the logistical support center, the command post, the nucleus of the Guard's activities when on active duty. Unrestricted access and communications, and a safe base from which the Guard can operate, are essential to the efficient performance of the Guard's mission in preventing or quelling civil disturbance.

These factors being anticipated, i. e., the mobilization of the Guard and its direction from the Armory, the Revolutionary Committee's convention inevitably being at the vortex of any civil disturbance which might arise, appellants' argument that they are being deprived of their constitutional right to free speech and assembly and to equal protection of the laws can be evaluated in its proper light. Appellants say the only building in the District of Columbia which will suffice for their constitutional convention is the National Guard Armory. It so happens that by Act of Congress this is the building in the District of Columbia which is the mobilization point, headquarters, logistical support, and command center for the District of Columbia National Guard. And it so happens that Congress has said, not surprisingly, that the use of the Armory by the National Guard is its primary purpose.

In Adderley v. Florida, 385 U.S. 39, at 47–48, 87 S.Ct. 242, 17 L.Ed.2d 149, the Supreme Court held:

> The State, no less than private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated. For this reason there is no merit to the petitioners' argument that they had a constitutional right to stay on the property, over the jail custodian's objections, because this "area chosen for the peaceful civil rights demonstration was not only 'reasonable' but also particularly appropriate * * *." Such an argument has as its major unarticulated premise the assumption that people who want to propagandize protests or views have a constitutional right to do so whenever and however and wherever they please. That concept of constitutional law was vigorously and forthrightly rejected in two of the cases petitioners rely on. Cox v. Louisiana, *supra*, [379 U.S. 536] at 554–555, 563–564 [85 S.Ct. 453, 13 L.Ed.2d 471]. We reject it again. The United States Constitution does not forbid a State to control the use of its property for its own lawful non-discriminatory purpose.

Here, as in *Adderley, supra,* at 47, 87 S. Ct. at 247, the record does not support a conclusion that the use of the building was being denied because the Armory Board sought to stifle the objective of the meeting, but rather the Board was carrying out its statutory duty to see that the Armory be available for use for its primary purpose.

We do not think the Armory Board's action discriminatory. It is true that the Board has rented the Armory to other large groups, but not to a group which everyone agrees is highly likely to become the focal point of disturbance and reasonably to require the mobilization of the Guard. It is also true that part of the Armory has been rented to other groups at a time when the Guard was mobilized, but the experience of the Guard shows that this was a mistake, that it hampered the Guard's operations, and there is no obligation on the Armory Board to repeat past mistakes, particularly when the repetition might be dangerous for the community. We find the Board's action to be a reasonable exercise of its discretion in conformance with the standards prescribed by the statutes.[3]

Out of the 68.25 square miles of the District of Columbia the appellants have picked the most sensitive 140,000 square feet, *i. e.,* the nerve center of the National Guard's operations, in which to hold their convention. That convention and those drawn to it admittedly would reasonably cause the mobilization and operation of the Guard for its duration, and would be the focal point of any civil disturbance. It is no denial of free speech and assembly and no denial of equal protection of the laws to hold that appellants must look elsewhere for their convention site.

---

3. Under the circumstances of this case, this court approves the Board's discretionary action. In the future, however, the Board would be well advised to issue "rules, or criteria, or guide lines" for dealing with specific cases in accordance with the general principles prescribed by the applicable statute and the Constitution. Women Strike for Peace v. Hickel, 137 U.S.App.D.C. 29, 420 F.2d 597, 603 (1970).