In the Matter of SOL GORDON, as Director, Family Planning and Population Information Center, Respondent, *v.* FRANK WALKLEY, as Commissioner of Agriculture and Markets, Appellant.

Third Department, June 7, 1973.

*Thomas G. Conway* for appellant.

*Jules L. Smith* for respondent.

MAIN, J. This is an appeal from a judgment of the Supreme Court at Special Term, entered in Albany County on August 29, 1972, which granted petitioner's application, in a proceeding pursuant to CPLR article 78, for an order annulling the determination of the respondent.

In the spring of 1971, after his associates had discussed plans for an exhibit with the New York State Fair officials, petitioner was granted free exhibit space in the Art and Home Center of the fair. No mention was made at this time of a comic book, so-called, entitled " Zing Comix — Ten Heavy Facts about Sex ". Only after the 1971 Fair was in progress did the fair staff learn that the petitioner's group was distributing this comic at their exhibit. An official who was in charge of the Art and Home Center requested that the petitioner's group limit distribution of the comics to adults, and the petitioner refused. On the next day, the Director of the State Fair went to petitioner's exhibit and personally requested that distribution be discontinued entirely. The petitioner's group or organization agreed to remove the comic from the counter. However, the next day the Fair Director discovered that the group was furtively distributing the booklet or pamphlet by inserting it into a packet of other materials which were being handed out to patrons at the petitioner's exhibit.

In 1972 the petitioner was denied complimentary exhibiting space. When he sought rental space, he was informed that his request would be considered if he would give reasonable assurance to fair officials that the comic book would not be made available to or distributed to minors without the consent of their parents or any other adult responsible for the care of a child attending the fair. The petitioner rejected the proposal and, when his counter proposal to limit distribution of the pamphlet, if possible, to infants over the age of 14 years was rejected, this proceeding ensued.

The court below annulled the determination of the appellant which denied petitioner permission to establish an exhibit and to distribute his booklet at the 1972 New York State Fair and appellant here appeals.

Consideration of this matter is not rendered moot by the fact that the dates for the 1972 Fair have long since passed. This type of controversy is likely to recur and, as such, it is well settled that an appeal will be entertained (*East Meadow Community Concerts Assn.* v. *Board of Educ. of Union Free School Dist. No. 3,* 18 N Y 2d 129, 135).

At the outset, we must recognize that a duty is statutorily imposed upon the appellant Commissioner to hold a State Fair (Agriculture and Markets Law, § 31-b). This same section gives the appellant wide discretion in the conduct of such Fair. The appellant "may make, alter, suspend or repeal needed rules relating to such fair, including * * * the terms and conditions of entries and admissions, exhibits", etc. (*Id.*) It was in the exercise of this wide discretion that the appellant determined that space would not be available to the petitioner for the 1972 State Fair.

The particular object of this controversy is a comic, booklet or pamphlet on the subject of sex education. Its title is "Zing Comix — Ten Heavy Facts about Sex". We are reluctant to characterize or even describe it, for people's judgments and appraisals vary widely on presentations of this kind, as well as upon the subject matter with which the pamphlet deals. While the parties concede that the pamphlet is not obscene, it is fair to say that it suggests that sodomy is acceptable and it surely condones and encourages homosexuality and bisexuality, if one is so inclined, while conceding that the majority of people favor heterosexuality. In addition, the pamphlet chides and belittles parents, doctors and counselors and school sex educational programs and courses. Such references as "your parents don't tell you" and "that your doctors and counselors ain't talking about" and "your school is steppin' light aroun'" amply support such a conclusion.

While we most certainly do not share the author's views, we recognize his right to his own opinion and his constitutional right to express those views. However, his right to impose those views upon the young, the impressionable, the unguided, and the immature, in our opinion, is not an unbridled right (*Ginsberg* v. *New York,* 390 U. S. 629).

Our governments have long realized and acknowledged that experience and maturity, measured as best they can be by age, are prerequisite to the exercise of certain rights and privileges and so have provided that the attainment of a certain age is necessary in order to exercise that right or to accept that privilege. Our voting and licensing laws, minimum age for

service in public office, are but a few examples. Indeed, our Penal Law, in its sections dealing with sex offenses, uses age as a standard, in some instances, in determining the degree of the crime. We have obviously recognized, and rightly so, that experience and maturity, hopefully acquired with age, enable one, or, in any event, should enable one to make a wiser choice or decision and provide one with a better base for making decisions and judgments.

Here the Commissioner of Agriculture, upon learning of the content and circulation of the pamphlet in 1971, sought to prevent its distribution to the young. After agreeing to remove the pamphlet from the stand, petitioner again began to distribute the pamphlet by inserting it in a packet or package with other material. His application for space the year following was rejected because of his refusal to reasonably limit distribution and because of his failure to comply with his agreement with the Commissioner.

It is to be remembered that the State Fair, like other exhibitions of its kind, attempts to and does appeal to the very young. The scheduled events and contests and the displays are most usually designed to attract the attention of the young. 4-H Clubs, scout troops, cub scout troops, church organizations for the young, as well as grade school units, are invited to and do participate in the activities of the Fair. The petitioner's refusal to restrict the distribution of the pamphlet demonstrates a desire to place his booklet or pamphlet in the hands and in the minds of children of early age.

In view of all of the foregoing, we cannot conclude that the Commissioner has acted in an arbitrary or capricious manner, nor do we conclude that his action was discriminatory. We feel that his determination was justified. "The State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated" (*Adderley* v. *Florida,* 385 U. S. 39, 47). In the case at hand, the area in which petitioner desired to exhibit was the Art and Home Center of the Fair and is devoted to home and family types of exhibits. People who desire to propagandize their views do not have a constitutional right to do so whenever and however and wherever they please (*Adderley* v. *Florida, supra*). Property rights need not yield to the exercise of First Amendment rights where alternate means of communication exist (*Lloyd Corp.* v. *Tanner,* 407 U. S. 551). Certainly, there are other means by which the petitioner might distribute his comic, other than through an exhibit at the State Fair.

It should also be remembered that the appellant did not issue a blanket denial to the petitioner's request for space. The grant of space to the petitioner was merely conditioned upon the petitioner's assurance that the comic would not be given to minors, without the consent of either a parent or lawful guardian. In setting this condition, appellant is again well-supported by the law. Society may secure the healthy, well-rounded growth of its young people with a "broad range of selection". (*Prince* v. *Massachusetts,* 321. U. S. 158, 168.) Even in areas of protected freedoms, the State may control the conduct of children to an extent far greater than its scope of authority over adults (*Ginsberg* v. *New York,* 390 U. S. 629, *supra*). Indeed, because of its exigent interest in keeping objectionable material from children, the State may bar distribution to them of books recognized to be suitable for adults (*Bookcase, Inc.* v. *Broderick,* 18 N Y 2d 71, app. dsmd. 385 U.S. 12), and, most importantly, material may be determined to be objectionable for children, without regard to the traditional legal concept of "obscenity". (*Bookcase, Inc.* v. *Broderick,* 49 Misc 2d 355, 357, affd. 18 N Y 2d 71.)

Justice STEWART, concurring in *Ginsberg* v. *New York* (*supra*), reaches the heart of the matter. The constitutional guarantee of a society of free choice presupposes a citizenry with the capacity to choose. Where that capacity is lacking or not fully developed, as in children, government regulation is consistent with, and even implements, the First Amendment. Thus, the State may keep harmful reading matter from children, just as they may deny them the right to vote or to marry or to hold office.

We concede that there is no statute or rule involved, so that to enable the Commissioner to exercise prior restraint, there must be or must have been a demonstrable danger of immediate and irreparable injury to the public weal (*Matter of Rockwell* v. *Morris,* 12 A D 2d 272, 277–278, affd. 10 N Y 2d 721). What constitutes immediate and irreparable damage to the public welfare is somewhat vague. Some specific examples are set forth in *Beauharnais* v. *Illinois* (343 U. S. 250). There the court stated that the "freedom of speech" protected by the Constitution is not absolute at all times and under all circumstances and there are well-defined and narrowly-limited classes of speech, the prevention and punishment of which does not raise any constitutional problem, including the lewd and obscene, the profane, etc.

The judgment should be reversed, on the law and the facts, with costs.

HERLIHY, P. J. (concurring).  We agree with the result reached by Mr. Justice MAIN.

However, in my view the sole issues upon appeal are (1) whether the Commissioner may attach conditions to his permits for space at the Fair, and (2) whether the condition that the subject literature could not be disseminated to children unless with consent of an accompanying adult would be so discriminatory as to be unreasonable.

The right of the Commissioner to attach conditions to the grant or leasing of exhibition space is not seriously disputed. He has exclusive control over all questions of privileges extended to concessionaires and exhibitors, as well as any other matters which he may deem proper in connection with such Fair (Agriculture and Markets Law, § 31–b).  It has long been established that in regard to children, the State is able to exercise discretion in determining what is and is not in their best interests.  In the present situation the Commissioner is the representative of the State and should have no less power than the Commissioner of Education in regard to the dissemination of literary material in schools.  The cases cited in Mr. Justice MAIN's opinion establish the distinction between the relationship of the State to infants and its relationship to adults.

The operation of a Fair by its very nature is unique and complex and those responsible for its operation, within proper boundaries, must be vested with acceptable managerial discretion.  Under the facts presented, we find no abuse of that discretion nor do we find a violation of the First Amendment guarantees.

GREENBLOTT, J. (dissenting).  I dissent and vote to affirm.

Freedom of expression holds a preferred position in our jurisprudence against the imposition of governmental restrictions.  It is recognized that certain narrowly defined forms of expression, such as obscenity, do not come within the protective umbrella of the First Amendment.  The expression which the appellant would restrict here by denying an exhibition space at the State Fair to petitioner is conceded by appellant to be not obscene, and no attempt has been made to fit it within any other unprotected category.

I do not doubt that the State has the power to impose greater restrictions on forms of expression directed at children than it would have if such expressions were intended for adults.  That proposition has been firmly implanted by the United States Supreme Court (*Ginsberg* v. *New York,* 390 U. S. 629) and by our own Court of Appeals (*Bookcase, Inc.* v. *Broderick,* 18 N Y

2d 71). However, neither of those cases, nor any other, support the view that anything done by governmental authority under the guise of protecting children from objectionable material will withstand constitutional scrutiny; for it is equally well settled that governmental action in this field cannot be undertaken arbitrarily. In *Interstate Circuit* v. *Dallas* (390 U. S. 676) decided together with *Ginsberg* (*supra*) the Supreme Court invalidated a municipal licensing statute which would have required motion pictures to be rated as "suitable" or "not suitable for young persons". Quoting from the concurring opinion of then Judge FULD in *People* v. *Kahan* (15 N Y 2d 311, 313), the court said (p. 689): "'It is * * * essential that legislation aimed at protecting children from allegedly harmful expression — no less than legislation enacted with respect to adults — be clearly drawn and that the standards adopted be reasonably precise so that those who are governed by the law and those that administer it will understand its meaning and application.'"[1]

The court went on to hold that an absence of standards was fatal to the legislation before it. It should be noted that in doing so, the Supreme Court was not breaking new ground, for many years earlier it had declared that "New York cannot vest restraining control over the right to speak * * * in an administrative official where there are no appropriate standards to guide his action." (*Kunz* v. *New York*, 340 U. S. 290, 295).

Here, there are likewise no standards, which require that this case be distinguished from *Ginsberg* and *Bookcase*. Nor is it enough to state, as does Mr. Justice MAIN, that material may be objectionable for children even though it does not meet the traditional legal test of "obscenity", for such a negative approach does not set forth standards and procedures for determining what is objectionable for children, nor does it tell us who is to

---

1. I think it worthy of note that in *Interstate Circuit*, the rating authority resided in a duly constituted board. Here, the appellant has arbitrarily taken upon himself the duty of protecting the State's children. To suggest, as does the majority, that appellant's "wide discretion" to make "needed rules" relating to the State Fair empowers him to interfere with constitutional freedoms is to suggest that any governmental official has the power to censor any form of speech which is somehow, directly or indirectly, related to his official functions. The simple language of the First Amendment clearly dispels such a view. Nor can I agree with Mr. Justice HERLIHY that the appellant has no less power than the Commissioner of Education. The latter official is vested with authority over dissemination of literature to school children, and his expertise qualifies him to make judgments as to the materials which *the State* will distribute to children in the course of their education. We are not concerned in this case with literature which is to be distributed by the State, nor does appellant have either authority or expertise equivalent to that of the Commissioner of Education.

make the decision. Even the term " objectionable " is insufficiently precise, for whereas some might feel that sexual materials are harmful, others might take objection to anything ranging from the teaching of biology to the teaching of socialist theory. The fact, however, that certain thoughts might be in poor taste or present ideas with which others disagree does not take those thoughts out of the First Amendment. In *Ginsberg,* materials to which minors might have exposure were restricted if they depicted specifically described sexual situations and were " harmful to minors " in a manner specifically described. Here, there are no limitations on the types of material which might be proscribed, nor was any test set up for determining whether such materials might be harmful. Thus, appellant was acting in his unfettered discretion, and in the field of free expression, the exercise of such " discretion " is arbitrary.[2]

Mr. Justice MAIN also seeks to sustain appellant's action by arguing that the State, " no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated ", relying upon *Adderley* v. *Florida* (385 U. S. 39, 47). In *Adderley (supra)* the property in question was the grounds of a jail upon which a protest demonstration was sought to be held, and an important governmental function might have been impeded by a large gathering, wherefore demonstrations by any and all groups were prohibited. The court took pains to point out that the denial of access to the jail grounds was not based upon what the demonstrators said or their objectives. Here, to the contrary, there is no essential governmental activity which petitioner's presence would interfere with, and admittedly appellant disagrees with the ideas petitioner seeks to express. As noted by Special Term, since the Fair " does not exclude all organizations which seek to proselytize its patrons, the Fair may not discriminate against petitioner."[3]

---

2. Interestingly, the appellant did not argue either at Special Term or on appeal, that the comic book was in fact harmful to minors — although successfully convincing this court of such a fact should not legitimize a prior restraint which was invalid when imposed.

3. Mr. Justice MAIN also takes the view that property rights need not yield to First Amendment rights in certain situations, relying on *Lloyd Corp.* v. *Tanner* (407 U. S. 551). There, however, the property was truly private — it was not operated by a State agency. This distinction is fundamental, for it is State action which is prohibited by the First and Fourteenth Amendments, and not restrictions on expression imposed by private parties, as the Supreme Court itself noted in its opinion (407 U. S., at p. 567). It is also worthy of note there that the restriction against handbilling involved in *Lloyd* was enforced against any and all persons.

Finally, Mr. Justice MAIN suggests that appellant was not acting improperly for he did not completely deny the use of space to petitioner, but "merely conditioned" that use upon the desired limitation on appellant's freedom of expression. The Constitution, however, does not draw distinctions by degrees in prohibiting the abridgement of freedom of speech, and any requirement that a party refrain from exercising that freedom as a condition to obtaining a benefit which is otherwise available without restriction is as obnoxious an abridgement of the freedom as any other no matter how direct. I therefore vote to affirm the judgment at Special Term.

COOKE, J. (dissenting). In view of the concession by the appellant that the material is not pornographic, as well as the absence of a valid statute or regulation authorizing the action taken by the Director of the State Fair and setting forth standards for the exercise of his discretion, I dissent and vote to affirm.

HERLIHY, P. J., and KANE, J., concur with MAIN, J., in a separate opinion by HERLIHY, P. J.; GREENBLOTT and COOKE, JJ., dissent and vote to affirm in separate opinions.

Judgment reversed, on the law and the facts, with costs.