[No. 41298.    En Banc.    February 11, 1971.]

THE STATE OF WASHINGTON, *Respondent,* v. WALDEMAR AGER
OYEN *et al., Appellants.*\*

\*Reported in 480 P.2d 766.

*Michael H. Rosen, Christopher E. Young,* and *Jan E. Peterson,* for appellants.

*James P. Thompson* and *William A. Gardiner,* for respondent.

HAMILTON, C. J.—Defendants were convicted of violating RCW 9.87.010, which provides, in part:

Every—

. . .

(13) Person, except a person enrolled as a student in or parents or guardians of such students or person employed by such school or institution, who without a lawful purpose therefor wilfully loiters about the building or buildings of any public or private school or institution of higher learning or the public premises adjacent thereto—

Is a vagrant, and shall be punished by imprisonment in the county jail for not more than six months, or by a fine of not more than five hundred dollars.

On appeal to this court, defendants challenge the validity of the quoted portion of the statute, contending that it is inapplicable as to them and their alleged activities and that it is unconstitutionally vague and overly broad.

The matter was heard in superior court, and comes here on stipulated facts. The pertinent circumstances are these:

The board of directors of the school district embracing Sehome High School in the city of Bellingham, promulgated and had in force at all times in question a regulation providing that any nonschool-related handouts or leaflets distributed to students on the school premises be first approved by the superintendent. This included, but was not limited to, notices and leaflets announcing youth programs, sponsored by such organizations as the YMCA, YWCA, Boy Scouts, Girl Scouts, etc.

On November 25, 1968, one of the defendants, Joe Eugene Start, contacted the principal of the high school regarding the distribution of leaflets at the school together with the possibility of a school assembly to discuss varying views concerning the selective service system and the draft. He

was at that time advised of the school board's regulation and of the approval required thereunder.

Without further effort to comply with the regulation, the eight defendants, including Mr. Start, appeared on the school premises at 7:30 a.m., November 26, 1968, stationed themselves under a covered walkway adjacent to the school bus unloading area, and each commenced the distribution of pamphlets, entitled "Channeling" and "Uptight with the Draft," to the students as they left their busses preparatory to entering classes. Shortly after this activity started, the school principal appeared and advised defendants of the regulation concerning the distribution of materials on campus, their noncompliance therewith, and thrice asked them to leave. The defendants refused to desist and depart, whereupon the principal called the Bellingham Police Department.

A police officer later arrived and informed defendants that, under the circumstances, their presence and actions constituted a violation of state law and that it would be necessary to arrest them if they did not leave the premises. The defendants responded to the officer's warning by stating that they considered the law to be unconstitutional, and that they refused to cease their activities short of arrest. The officer then arrested them and booked them at the city jail for the violation of law of which they were subsequently convicted. After booking, the defendants were released upon their personal recognizance pending trial.

The defendants were not students or employees of the Sehome High School nor were they parents or guardians of any students attending the school. Approximately 150 students were present and observed the incidents leading up to the arrest of defendants. Except for some student boos and hisses expressing disapproval of the defendants, no violence occurred.

Prefatory to addressing our attention to the issues presented on this appeal, we deem it appropriate to make three general observations.

■ First, when the constitutionality of a statute is assailed there arises a presumption of the enactment's con-

stitutionality and it will not be judicially declared uncon-
stitutional unless its repugnancy to the constitution clearly
appears or is made to appear beyond a reasonable doubt.
*Clark v. Dwyer,* 56 Wn.2d 425, 353 P.2d 941 (1960), *cert.
denied,* 364 U.S. 932, 5 L. Ed. 2d 365, 81 S. Ct. 379 (1961).
Furthermore, if the statute is reasonably capable of a con-
stitutional construction it will be given that construction.
*State ex rel. Starkey v. Alaska Airlines, Inc.,* 68 Wn.2d 318,
413 P.2d 352 (1966); *Seattle v. Drew,* 70 Wn.2d 405, 423
P.2d 522, 25 A.L.R.3d 827 (1967). Where, however, rights
guaranteed under the first amendment to the United States
Constitution may be involved in the reach of a questioned
statute, courts must scrutinize the legislation with great
care to be certain that fundamental freedoms are not imper-
missibly curtailed. *Ashton v. Kentucky,* 384 U.S. 195, 16
L. Ed. 2d 469, 86 S. Ct. 1407 (1966).

Second, the education of the youth of our nation has
historically been of supreme concern and interest to our
citizenry. The Ordinance for the Northwest Territorial
Government, 1787, Art. 3, declared: "Religion, morality, and
knowledge being necessary to good government and the
happiness of mankind, schools, and the means of education
shall forever be encouraged." The Enabling Act of 1889,
section 4, Fourth, 25 Stat. 676, conditioned the admission
of the states of North Dakota, South Dakota, Montana,
and Washington upon the premise "That provision shall be
made for the establishment and maintenance of systems of
public schools, . . ." Our state constitution asserts "It
is the paramount duty of the state to make ample pro-
vision for the education of all children residing within
its borders, . ." Const. art. 9, § 1. Consistent and in
keeping with the doctrine thus enunciated our first state
legislature established a general uniform public education
system, the property, buildings, and facilities for which
were to be acquired, financed, constructed, maintained, and
administered through the cooperation of state, county, and
school district agencies and officers. Subsequent legislatures,
although reenacting, amending, and modifying school codes,
have not deviated from the central theme—that it is a

914

preeminent duty and obligation of local and state government to amply provide, promote, and protect the inalienable right of each young generation to a sound, meaningful and proficient education taught in an appropriate environment, under compatible conditions, and subject to reasonable regulations. *Newman v. Schlarb*, 184 Wash. 147, 50 P.2d 36 (1935); *State ex rel. DuPont-Fort Lewis School Dist. 7 v. Bruno*, 62 Wn.2d 790, 384 P.2d 608 (1963).

Third, RCW 9.87.010(13) is in the nature of a preventative measure enacted under the reserved police power of the state. Its apparent legislative design is to provide school administrators and law enforcement agencies with a means by which to exercise some degree of control over activities on or about school premises which are unrelated to legitimate school purposes and being carried on by unauthorized individuals not associated with the school's academic community. Undoubtedly, it is aimed at maintaining a scholastic atmosphere as well as protecting school properties and preserving the moral and physical safety and well-being of the student body from the intrusion and harassment of degenerates, dope peddlers, pornographers, vandals, troublemakers in general, and other persons who might perversely wish to indiscriminately utilize school premises for purposes detrimental to or unconnected with the basic educational processes to which the properties are dedicated. In this vein, it is essential to recognize the fact that while school properties are public in the sense that they are endowed and operated with taxpayers' money, they are not public in the sense that any member of the general public may, when and if he pleases, use such properties for his own personal objectives or the dissemination of his own personal views. Accordingly, the uses to which such properties may be put by members of the public, otherwise unaffiliated with the school operation, are properly subject to reasonable statutory, as well as administrative, regulation and proscription. *People v. Johnson*, 6 N.Y.2d 549, 190 N.Y.S.2d 694, 161 N.E.2d 9 (1959); *People v. Sprowal*, 49 Misc. 2d 806, 268 N.Y.S.2d 444, *aff'd*, 17 N.Y.2d 884, 271 N.Y.S.2d 310, 218 N.E.2d 343, *appeal dismissed*, 385 U.S.

649, 17 L. Ed. 2d 670, 87 S. Ct. 768 (1966); *State v. Starr*, 57 Ariz. 270, 113 P.2d 356 (1941).

With these observations in mind, we turn to the merits.

Defendants, in essence, mount a 3-pronged attack upon RCW 9.87.010(13). They contend that, first, it is unconstitutionally vague; second, it is unconstitutionally overbroad; and, third, it was unconstitutionally applied to them and their conduct on the school premises involved.

We cannot agree with defendants' challenges.

■ The doctrine of void for vagueness was established by a series of United States Supreme Court cases, including *United States v. L. Cohen Grocery Co.*, 255 U.S. 81, 65 L. Ed. 516, 41 S. Ct. 298, 14 A.L.R. 1045 (1921); *Connally v. General Constr. Co.*, 269 U.S. 385, 70 L. Ed. 322, 46 S. Ct. 126 (1926); *Lanzetta v. New Jersey*, 306 U.S. 451, 83 L. Ed. 888, 59 S. Ct. 618 (1939); and *Baggett v. Bullitt*, 377 U.S. 360, 12 L. Ed. 2d 377, 84 S. Ct. 1316 (1964). The doctrine rests upon repugnancy to the due process clause of the fourteenth amendment to the United States Constitution. It is succinctly stated in *Landry v. Daley*, 280 F. Supp. 938, 951 (N.D. Ill. 1968), as follows:

> The concept of vagueness or indefiniteness rests on the constitutional principle that procedural due process requires fair notice and proper standards for adjudication. The primary issues involved are whether the provisions of a penal statute are sufficiently definite to give reasonable notice of the prohibited conduct to those who wish to avoid its penalties and to apprise judge and jury of standards for the determination of guilt. If the statute is so obscure that men of common intelligence must necessarily guess at its meaning and differ as to its applicability, it is unconstitutional.

(Footnotes omitted.)

The constitution, however, does not require impossible standards of specificity in penal statutes. It requires only that a questioned statute convey a sufficiently definite warning as to proscribed conduct when measured by common practice and understanding. And, the test will be met if there are well-settled and ordinarily understood meanings for the words employed when viewed in the context of the

entire statutory provision. *United States v. Petrillo,* 332 U.S. 1, 91 L. Ed. 1877, 67 S. Ct. 1538 (1947); *United States v. Harriss,* 347 U.S. 612, 98 L. Ed. 989, 74 S. Ct. 808 (1954).

Defendants, in their challenge, focus primarily upon two of the terms found in RCW 9.87.010(13) and contend that by virtue of their indefiniteness the statute is impermissibly vague. These are the word "loiter" and the phrase "without a lawful purpose." These terms, however, must be considered in connection with the provision as a whole.

■ After defining the word "loiter," in its commonly understood sense, to mean standing, idling, lingering or loafing about a given place, we held in *Seattle v. Drew,* 70 Wn.2d 405, 423 P.2d 522, 25 A.L.R.3d 827 (1967), that the word standing alone, or otherwise unqualified by ascertainable standards, did not connote wrongdoing or imply a sinister motive. In so holding we struck down, as unconstitutionally vague, a city ordinance purporting to penalize a person for failing to give a satisfactory account of himself upon demand of a police officer when found loitering abroad at night. We noted, however, that the distinction between a valid and effective loitering ordinance or statute and an impermissibly vague one is language within the ordinance or statute which spells out, and enables an ordinary citizen to know, the dividing line between innocent loitering and unlawful loitering.

We are satisfied that, in the full context of RCW 9.87 .010(13), the kind of loitering condemned as unlawful is fully qualified by ascertainable standards and is amply spelled out in terms readily understandable to the average person. The proscribed loitering is specifically limited as to type, place, persons, and tenor.

■ The type of loitering interdicted is "willful." The word willful is not ambiguous. When used in a penal statute it is ordinarily understood to mean an act committed intentionally, deliberately and/or designedly as distinguished from one done accidently, inadvertently, innocently and/or with lawful excuse. *State v. Stewart,* 73 Wn.2d 701, 440 P.2d 815 (1968); *State v. Russell,* 73 Wn.2d 903, 442 P.2d 988

(1968). Thus, innocent loitering is not prohibited by the statute. Only willful loitering is condemned.

The place of the enjoined loitering is clearly confined to premises dedicated and devoted to educational purposes and the public premises immediately adjacent thereto. Loitering elsewhere is not barred by the statute.

The class of persons precluded from willfully loitering about the premises of educational institutions are those who are not (a) enrolled students, (b) parents or guardians of enrolled students, and (c) employees of the institution. The statute is unambiguous in this respect.

Finally, the tenor of the circumscribed loitering is that done "without a lawful purpose." This phrase, while not wholly free of ambiguity, fairly imports, in the context used, willful loitering which is not legitimately related to school purposes. It embraces those, within the prescribed class of persons, who would trespass and remain upon the designated premises without authorization and without valid school connected business, as well as those who would do so with criminal motives. The statute does not purport to impose restrictions upon any who enter school premises for school associated purposes. *People v. Parker,* 208 Misc. 978, 138 N.Y.S.2d 2 (1955); *People v. Johnson,* 6 N.Y.2d 549, 190 N.Y.S.2d 694, 161 N.E.2d 9 (1959); *People v. Dennis,* 208 N.Y.S.2d 522 (1960); *People v. Sprowal,* 49 Misc. 2d 806, 268 N.Y.S.2d 444, *aff'd,* 17 N.Y.2d 884, 271 N.Y.S.2d 310, 218 N.E.2d 343, *appeal dismissed,* 385 U.S. 649, 17 L. Ed. 2d 670, 87 S. Ct. 768 (1966); *State v. Starr,* 57 Ariz. 270, 113 P.2d 356 (1941). *Cf. People v. Bell,* 306 N.Y. 110, 204 Misc. 71, 125 N.Y.S.2d 117, 115 N.E.2d 821 (1953); *People v. Merolla,* 9 N.Y.2d 62, 211 N.Y.S.2d 155, 172 N.E.2d 541 (1961).

These statutory standards and limitations, in our view, are sufficiently definite and specific to give any ordinary person of common intelligence wishing to avoid the interdiction of RCW 9.87.010(13) reasonable notice of the prohibited conduct. The provision, therefore, squares with procedural due process and is not unconstitutionally vague.

Defendants' second contention relates to the reach of the statute. They contend it is so patently broad as to sweep

within its prohibitions constitutionally protected freedoms, particularly freedom of speech guaranteed under the first amendment to the United States Constitution. This they assert renders it unconstitutional on its face.

We disagree.

The theme of impermissible statutory overbreadth finds expression in numerous United States Supreme Court decisions, some of which are *Zwickler v. Koota*, 389 U.S. 241, 19 L. Ed. 2d 444, 88 S. Ct. 391 (1967); *Cox v. Louisiana*, 379 U.S. 536, 559, 13 L. Ed. 2d 471, 487, 85 S. Ct. 453, 466 (1965); *Edwards v. South Carolina*, 372 U.S. 229, 9 L. Ed. 2d 697, 83 S. Ct. 680 (1963); *Shelton v. Tucker*, 364 U.S. 479, 5 L. Ed. 2d 231, 81 S. Ct. 247 (1960); *Cantwell v. Connecticut*, 310 U.S. 296, 84 L. Ed. 1213, 60 S. Ct. 900 (1940).

■ Distinguishing it in principle from the void for vagueness doctrine, the court in *Landry v. Daley*, 280 F. Supp. 938, 951 (N.D. Ill. 1968), expresses the theory thusly:

> The concept of overbreadth, on the other hand, rests on principles of substantive due process which forbid the prohibition of certain individual freedoms. The primary issue is not reasonable notice or adequate standards, although these issues may be involved. Rather the issue is whether the language of the statute, given its normal meaning, is so broad that its sanctions may apply to conduct protected by the Constitution. Frequently, the resolution of this issue depends upon whether the statute permits police and other officials to wield unlimited discretionary powers in its enforcement. If the scope of the power permitted these officials is so broad that the exercise of constitutionally protected conduct depends on their own subjective views as to the propriety of the conduct, the statute is unconstitutional.

(Footnotes omitted.)

■ In applying the concept in situations where freedom of speech may be concerned, it is essential to bear in mind that an otherwise valid statute, which, in protecting important societal interests, makes a particular course of conduct illegal, does not run afoul of the constitution merely because the right of free speech may be intermingled with the condemned conduct. *Cox v. Louisiana, supra; United*

*States v. O'Brien,* 391 U.S. 367, 20 L. Ed. 2d 672, 88 S. Ct. 1673 (1968); *Cameron v. Johnson,* 390 U.S. 611, 20 L. Ed. 2d 182, 88 S. Ct. 1335 (1968); *Adderley v. Florida,* 385 U.S. 39, 17 L. Ed. 2d 149, 87 S. Ct. 242 (1966); *Kovacs v. Cooper,* 336 U.S. 77, 93 L. Ed. 513, 69 S. Ct. 448 (1949).

In such situations, however, it is incumbent upon the court to weigh the purported impairment of speech engendered by the statutory provision against the importance of the societal interest sought to be vindicated by the statute, as well as the nature and extent of the threat which the statutorily forbidden conduct poses to that interest. And, too, the alternatives available to the state and the claimant must be evaluated, *i.e.,* whether the state may achieve its ends in a less restrictive manner and/or the claimant effect his communication in a way less detrimental to the societal interest.

■ Defendants' argument that RCW 9.87.010(13) patently sweeps within its ambit the constitutionally protected freedom of speech, in our opinion, overlooks and deemphasizes the principal thrust of the statute.

As we have pointed out, the statute is plainly aimed at maintaining and preserving the integrity of a paramount societal interest—the effective education of our youth in safe, orderly, and compatible surroundings. To accomplish this purpose, the enactment concerns itself with a form of conduct—willful loitering—by a designated class of persons carried on about a particular quasi public area—school premises. It is not directed toward proscribing freedom of expression, and insofar as it may incidentally affect that freedom, the basic social interest it seeks to protect far outweighs such an incidental result. Neither does the statute vest in police or other officials any unlimited discretionary powers in its enforcement nor call upon their subjective views as to the propriety or impropriety of a course of conduct. The statute is definite and specific—not vague—in its proscription. Furthermore, we find no reasonable, less restrictive means by which the legislature could restrain willful loitering about school properties. And, we do not deem it an undue hardship upon defendants or a consti-

tutionally impermissible alternative that they be denied the untrammeled use of school premises for the dissemination of their personal views, when and in such fashion as they themselves may elect.

We conclude that the statute is not overly broad on its face.

By their third contention, defendants maintain that RCW 9.87.010 (13) was unconstitutionally applied to them because (a) they were exercising their right of free speech, and (b) the school board regulation, requiring approval of the school superintendent before leaflets could be distributed to students, constituted an impermissible prior restraint upon free speech. In support of this argument, defendants point to *Tinker v. Des Moines Independent Community School Dist.*, 393 U.S. 503, 21 L. Ed. 2d 731, 89 S. Ct. 733 (1969), wherein the United States Supreme Court upheld the right of junior and senior high school students to wear black arm bands to classes in protest of the Viet Nam conflict, despite countervailing school regulations.

We do not consider the holding of the *Tinker* case to be applicable to the instant circumstances. The *Tinker* case dealt with the constitutional rights of students. It did not concern itself with the rights or obligations of nonstudents or others unassociated with the school community.

In the instant case, it is established by stipulation that the defendants knew of the school board regulation involved, made no realistic or good faith effort to comply with it, deliberately came upon the school premises and commenced distributing their leaflets in outright defiance of the rule, refused to leave when asked by the principal, and effected a confrontation with the police officer when he arrived, all in the presence of the students as they were about to enter their classrooms. Under these circumstances we believe the teaching of *Adderley v. Florida*, 385 U.S. 39, 17 L. Ed. 2d 149, 87 S. Ct. 242 (1966), applies.

In *Adderley* civil rights demonstrators without permission congregated upon the premises of a county jail. The sheriff as custodian of the jail requested that they leave. They refused. The sheriff arrested them under a penal tres-

pass statute, and they were convicted of a violation of that statute. Upholding the convictions against the contention that the demonstrators were thereby unconstitutionally deprived of the First Amendment freedoms, the United States Supreme Court stated, at page 47:

Nothing in the Constitution of the United States prevents Florida from even-handed enforcement of its general trespass statute against those refusing to obey the sheriff's order to remove themselves from what amounted to the curtilage of the jailhouse. The State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated. For this reason there is no merit to the petitioners' argument that they had a constitutional right to stay on the property, over the jail custodian's objections, because this "area chosen for the peaceful civil rights demonstration was not only 'reasonable' but also particularly appropriate . . . ." Such an argument has as its major unarticulated premise the assumption that people who want to propagandize protests or views have a constitutional right to do so whenever and however and whereever they please. That concept of constitutional law was vigorously and forthrightly rejected in two of the cases petitioners rely on, *Cox v. Louisiana, supra* [379 U.S. 536, 559, 13 L. Ed. 2d 471, 487, 85 S. Ct. 453, 466 (1965)], at 554-555 and 563-564. We reject it again. The United States Constitution does not forbid a State to control the use of its own property for its own lawful nondiscriminatory purpose.

(Footnote omitted.)

There is no evidence before us in this case to the effect that school officials were discriminatory in administering the rule relating to the distribution of leaflets to students. Neither is there any evidence that the principal asked defendants to leave because he objected to the material they were distributing or disagreed with the views they sought to express. On the contrary, he asked them to leave the premises because, in willful defiance of the school rule, they were seeking to distribute their leaflets when, where, and how they saw fit on premises dedicated to a lawful purpose. They thereby became trespassers upon school property and willful loiterers within the provisions of RCW 9.87.010(13).

. In conclusion, we find no merit in defendants' argument that the school board regulation amounted to an unconstitutional prior restraint upon their right of free speech. The regulation on its face is not an unconstitutional, unlawful or unreasonable one, and there is no showing whatsoever that it was administered unfairly, unequally or in a discriminatory fashion, *e.g.*, that pro-war or selective service pamphleteering was permitted while anti-war and anti-draft leaflets were banned.

The judgment of the trial court is affirmed.

FINLEY, ROSELLINI, HUNTER, HALE, McGOVERN, and STAFFORD, JJ., and HILL, J. Pro Tem., concur.

