UNITED STATES of America, Plaintiff,

v.

Abraham GILBERT, Defendant.

Civ. A. No. 1:88–CV–27–JTC.

United States District Court,
N.D. Georgia,
Atlanta Division.

June 22, 1989.

Jane Wilcox Swift, Office of U.S. Atty., Atlanta, Ga., for plaintiff.

Donald Franklin Samuel, Garland Firm, Atlanta, Ga., for defendant.

### ORDER

CAMP, District Judge.

This action comes before the Court on plaintiff's Motion for Summary Judgment and defendant's Motion for Summary Judgment. For the reasons detailed below, plaintiff's Motion is GRANTED and defendant's Motion is DENIED.

I. *Background*

In 1979, defendant Abraham Gilbert initiated an employment discrimination suit in the Northern District of Georgia against his employer, the Olympic Manufacturing Company. *See Abraham Gilbert v. Olympic Manufacturing Company*, Civil Action No. C79–2223A. The district court granted summary judgment for defendant Olympic Manufacturing Company and in 1981, the Fifth Circuit affirmed. Convinced that the federal courts treated him unfairly, Mr. Gilbert has been conducting an around-the-clock "protest vigil" for the past eight years beneath the overhang on the plaza level outside the Richard B. Russell Federal Building [1].

1. The Richard B. Russell Federal Building hous-  es the Federal District Court for the Northern

Plaintiff, the United States of America, brought this action in 1988 to enjoin defendant Gilbert's alleged continuing trespass on Government property. Plaintiff has moved for summary judgment and seeks to enjoin defendant from using the Russell Building as his abode. In opposition to the Government's request for injunctive relief and in support of his own Motion for Summary Judgment, defendant contends that his persistent vigil constitutes a protest protected by the First Amendment to the United States Constitution.

## II. *Findings of Fact*

After a thorough review of the record and the testimony presented at a full evidentiary hearing conducted on March 22, 1989, the Court makes the following findings of fact:

The Richard B. Russell Federal Building (hereinafter "Russell Building") is located at 75 Spring Street, S.W., Atlanta, Georgia 30303. The Russell Building is owned by the United States of America and is under the direct control of the General Services Administration (hereinafter "GSA"). *See* Affidavit of Thomas E. Davis, attached as Exhibit "1" to Plaintiff's Motion for Summary Judgment.

The ground level of the Russell Building is partially unenclosed. A glass partition, recessed approximately thirty feet from the exterior support columns of the building, separates the interior lobby area from what could be termed a "portico". Transcript at 72. The concrete columns support the twenty-three stories above the ground level of the Building. The portico extends from the glass partition to the support columns and is covered by the "overhang" of the upper floors of the building. Defendant has resided on the portico for almost eight years.

The Russell Building has six entrances on the Spring Street side. *Id.* at 72. When one exits the building on the Spring Street side, he or she steps from the lobby onto the portico. The portico extends approximately thirty feet. *Id.* When one walks from under the overhang of the upper floors, he or she walks several more feet

District of Georgia along with several other fed-

before reaching twelve steps which lead down into a large plaza. *Id.* at 99. The plaza is bound on the west by the steps, on the north by Martin Luther King, Jr. Drive, on the east by Spring Street, and on the south by Mitchell Street. Throughout this Order, the Court will refer to the area under the overhang, just outside the glass wall of the Russell Building lobby, as the portico. The uncovered stretch just outside the columns, the steps, and the plaza beyond will be characterized as the unenclosed plaza.

Experienced demonstrators testified that the location of the Russell Building is not ideal for protests or marches because it is outside the heart of downtown Atlanta. *Id.* at 140–41. Demonstrators at the Russell Building have often found it difficult to attract the attention of the media or passersby. *Id.* Nevertheless, the plaza has become a meaningful forum for protest. Housing the United States District Court for the Northern District of Georgia, the Office of the United States Attorney, and numerous other federal agencies, the Russell Building has become the symbol of the Federal Government in metropolitan Atlanta. GSA routinely issues permits for demonstrations on the unenclosed plaza surrounding the Russell Building. Transcript at 115. However, both Government and defense witnesses testified that many demonstrations have been staged, and tolerated by GSA, without permits. *Id.* at 116, 140.

While many demonstrations have taken place on the unenclosed plaza area in front of the Russell Building, GSA has an unwritten policy of excluding demonstrators from the portico area. *Id.* at 117, 124. The purpose of this policy is to keep the area open for pedestrian traffic, to allow easy access to the building, and to protect the building and its occupants in case of an emergency. *Id.* at 117. Although several witnesses testified that demonstrators had occasionally used the portico during protest activity, even defense witness Roger Friedman noted that "there is usually someone out there [who] asks you to move on eventually." *Id.* at 153. To the knowledge of

eral agencies.

GSA officials responsible for the Building, no demonstrations have ever been staged on the portico. *Id.* at 117. While overnight protests have been authorized by GSA, none was conducted on the portico and none has lasted longer than twenty-four hours. *Id.* at 116–17.

Defendant Gilbert intends his presence on the portico of the Russell Building to be a protest against certain Government activity. Initially, he protested the court's order granting summary judgment against him in his employment discrimination suit. The scope of defendant's protest has subsequently broadened: he now complains that the Government, specifically the F.B.I., has followed him, framed him for stealing, poisoned him, and was responsible for the stillborn birth of his child. *Id.* at 168–85.

In 1981, when defendant first appeared at the Russell Building, he simply sat on a lawn chair during normal business hours and displayed a placard bearing a written message. *Id.* at 74, 82. Some time later, defendant's activities outside the Russell Building blossomed into an around-the-clock vigil. *Id.* at 64. Defendant brought a pad on which to sleep, blankets, and other articles of personal property[2] and placed them on the portico, adjacent to the glass wall of the Russell Building on the Spring Street side. *Id.* at 65, 76. Although defendant's bedroll is situated on the portico, a walkway which would otherwise be available for pedestrian traffic, it does not obstruct the ingress or egress of the building. *Id.* at 65, 67–68, 72–73, 78, 109, 137–38, 158.

For the past eight years, defendant has used the Russell Building as his residence: he sleeps on the portico, bathes and does his laundry in the public restrooms, dries his clothes on the newspaper boxes on the portico, and is often seen in the lobby, hallways, and cafeteria. *Id.* at 65–66, 69, 74, 112–13. Defendant has sometimes displayed a placard near or partially underneath his bedroll, but his protest has consisted almost exclusively of his continued presence. *Id.* at 64–67, 82, 113, 138, 149–154.

Defendant's presence, although intended as a protest, does not convey a message to most objective observers. *Id.* at 66, 76, 85, 91, 115. Defense witnesses testified that defendant usually displays his sign but Government witnesses disagreed. Government witnesses testified that they had not seen a sign in almost two years and that they are unable to glean any message from defendant's presence. *Id.* at 66, 76, 82. Even those individuals who recognize defendant's presence as a protest were unable to articulate the reasons behind the protest or to discern any message beyond what they may have read on his sign. Defense witness Roger Friedman testified that defendant's presence constituted a protest. When asked to describe the substance of that protest, however, Mr. Friedman could only state that he had assumed defendant believed he was the victim of some sort of conspiracy. *Id.* at 149.

Unlike a sit-in at a segregated lunch counter or sleeping in the park to protest the plight of the homeless, defendant's presence bears no direct relationship to his intended message. The Court finds that without reading the writing inscribed on defendant's placard, objective observers are unlikely to understand defendant's message.

Defendant has engaged in disruptive behavior in and around the Russell Building, but such occurrences have been isolated. *See* transcript at 75, 83–85, 114–15. *See also* affidavit of Zenon Zakrzewski ¶¶ 1–2 and affidavit of Leamon C. Baxter ¶ 2, attached as exhibits 12 and 17 respectively to Plaintiff's Motion for Summary Judgment. Typically, such conduct has consisted of shouting at customers in the cafeteria or in other public areas of the building. *Id.* Defendant has threatened or engaged in violent behavior on two occasions. On October 24, 1986, defendant struck GSA cleaning supervisor Larry A. Durham. *See* affidavit of Larry A. Durham ¶ 5, attached as exhibit 14 to Plaintiff's Motion for Summary Judgment. In 1985, federal protective

---

**2.** Throughout this Order, the Court will refer to these accoutrements collectively as Mr. Gilbert's bedroll.

officer Richard E. Tolbert responded to a report that defendant was creating a disturbance in the cafeteria. Transcript at 85. After being placed under arrest, defendant threatened bodily harm to the federal protective officers and their families. *Id.* Despite defendant's sometimes rowdy behavior, the Court finds that he does not disrupt the daily operation of the building or the business conducted therein. *See* transcript at 98, 109, 137–38, 158.

In November of 1987, GSA delivered to defendant a letter informing him that his use of the portico as a residence constitutes a trespass. Third Declaration of Leamon C. Baxter ¶ 2, attached to Post–Hearing Brief in Support of Plaintiff's Motion for Summary Judgment and in Opposition to Defendant's Cross–Motion for Summary Judgment. The letter demanded that he remove his bedroll from the portico and leave the premises of the Russell Building. *Id.* GSA's interest in removing defendant is partly aesthetic. GSA officials indicated that they, as well as many visitors to the Russell Building, find his presence aesthetically offensive. *Id.* at 70, 79. The Court finds that the Government has a legitimate interest in both the aesthetics of the building and in keeping its walkways clear.

The Court also finds that defendant is violating two provisions of the Code of Federal Regulations, one prohibiting loitering and the other proscribing the obstruction of pedestrian walkways. Federal Property Management Regulations, 41 C.F.R. §§ 101–20.305, 101–20.312 (1988). *See infra* p. 1560.

Defendant has ignored GSA's demands that he remove his belongings and depart from the Russell Building. Today, he continues to use the Russell Building as his residence.

### III. *Summary Judgment Standard*

Rule 56(c), Fed.R.Civ.P., defines the standard for summary judgment: Courts should grant summary judgment when "there is no genuine issue as to any material fact ... and the moving party is entitled to judgment as a matter of law." In *Celo-*

tex Corp v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986), the Supreme Court interpreted Rule 56(c) to require the moving party to demonstrate that the nonmoving party lacks evidence to support an essential element of his claim. Thus, the movant's burden is easily "discharged by showing—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." Once the movant has met this burden, the opposing party must then present evidence establishing a material issue of fact. *Id.* The nonmoving party must go beyond the pleadings and submit evidence in the form of affidavits, depositions, admissions and the like, to demonstrate that a genuine issue of material fact does exist. *Id.* The Supreme Court stated in *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 257, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986), "that the plaintiff, to survive the defendant's motion, need only present evidence from which a jury might return a verdict in his favor. If he does so, there is a genuine issue of fact that requires a trial."

While all evidence and factual inferences are to be viewed in a light most favorable to the nonmoving party, *Rollins v. Tech-South, Inc.,* 833 F.2d 1525, 1529 (11th Cir. 1987); *Everett v. Napper,* 833 F.2d 1507, 1510 (11th Cir.1987), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." [3] *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative." *Id.* at 250, 106 S.Ct. at 2511. Similarly, a fact is not material unless it is identified by the controlling substantive law as an essential element of the nonmoving party's case. *Id.* at 248, 106 S.Ct. at 2510. Thus, the party opposing the summary judgment must come forward with specific evidence of ev-

---

**3.** In the case at bar, the Court has had the benefit of a full evidentiary hearing and is therefore in a good position to determine whether any *genuine* issues of material fact remain for trial.

ery element essential to his case so as to create a genuine issue of material fact for trial. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552; *Rollins,* 833 F.2d at 1528.

## IV.  *Conclusions of Law*

Mr. Gilbert's activities in and around the Russell Building can be broken down into two categories: using the Building as a residence, (which includes loitering, sleeping, bathing and doing laundry) and classic First Amendment activity (which includes chanting and displaying his placard). The Government seeks to enjoin both types of activity.

At the evidentiary hearing, plaintiff asked the Court to issue an injunction[4] containing the following provisions:

1. Mr. Gilbert must permanently remove his sleeping kit from federal property;

2. Mr. Gilbert must stop using the restroom facilities of the Richard B. Russell Federal Building for bathing or laundry.

3. Mr. Gilbert must refrain from any disruptive conduct inside the Russell Building;

4. Mr. Gilbert may engage in First Amendment activity only in the unenclosed, uncovered steps and plaza area surrounding the Russell Building;

5. The Government is authorized to remove Mr. Gilbert's sleeping kit if left unattended.

*See* transcript at p. 14–16. The Court will first address that part of plaintiff's proposed injunction which seeks to prevent defendant's use of the Building as a residence, i.e. his maintenance of a bedroll, his sleeping, loitering, and use of the restrooms for bathing and laundry. The Government's request to enjoin defendant from all First Amendment activity on the portico and inside the building presents a more difficult question and will be dealt with separately.

## A.  Use of the Premises as a Residence

The Court must resolve two issues: first, whether defendant's use of the premises as

a residence constitutes a trespass which can be enjoined, and second, whether an injunction prohibiting defendant from using the premises as a residence violates defendant's First Amendment right to protest.

### 1.  Trespass

■ The United States relies upon its rights as a property owner in seeking this injunction. Georgia law allows the remedy of injunction to prevent a continuing trespass, which is defined as any *unlawful* interference with a property right. *Dowdell et al. v. Cherry et al.,* 209 Ga. 849, 76 S.E.2d 499 (1953); *Roughton v. Thiele Kaolin Co.,* 209 Ga. 577, 581, 74 S.E.2d 844 (1953). The Government relies on Georgia's general criminal trespass statute to establish that Mr. Gilbert's conduct is unlawful.

O.C.G.A. § 16–7–21 provides in pertinent part:

(b) A person commits the offense of criminal trespass when he knowingly and without authority:  ...

(3) Remains upon the land or premises of another person ... after receiving notice from the owner, rightful occupant, or, upon proper identification, an authorized representative of the owner or rightful occupant to depart.

O.C.G.A. § 16–7–21(b)(3)'s proscription applies with equal force to publicly owned property. *E.P. et al. v. State of Georgia,* 130 Ga.App. 512, 203 S.E.2d 757 (1973) ("There is no merit to the contention that the phrase 'premises of another person' ... does not include property owned or used for public purposes.") Recently, the Georgia Court of Appeals stated that "the legislative intent of OCGA § 16–7–21(b)(3) is to criminalize an act of peaceful but unauthorized continued *presence* on public property for purposes other than those to which the property is dedicated." *Brooks v. The State,* 170 Ga.App. 440, 441, 317 S.E.2d 552 (1984) (citing *Adderley v. Florida,* 385 U.S.

---

**4.** At the March 22, 1989 hearing, the Government proposed a much narrower injunction then the one sought in the original Complaint. The Court assumes that the Government has modified its position and will therefore consider only the injunction outlined at the evidentiary hearing.

39, 47, 87 S.Ct. 242, 247, 17 L.Ed.2d 149 (1966), *reh'g denied,* 385 U.S. 1020, 87 S.Ct. 698, 17 L.Ed.2d 559 (1967) ("The State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated.")). Therefore, Mr. Gilbert's conduct constitutes a trespass if his use of the premises contravenes the purpose to which it has been dedicated.

Neither the unenclosed plaza nor the portico was intended to be used as a campsite. Maintaining a bedroll, sleeping, bathing, and doing laundry are all activities which contravene the purpose for which the Russell Building and its grounds were dedicated. Consequently, Mr. Gilbert's continued use of the property as a residence, after receiving notice to leave, is unlawful and constitutes a trespass under Georgia law.

■ The Court also finds that defendant's continued presence is unlawful in that it violates the Federal Property Management Regulations, 41 C.F.R. §§ 101–20.305, 101–20.312. § 101–20.305 prohibits "[a]ny loitering" on federal property. Loitering is defined in Webster's Third New International Dictionary as "remain[ing] in or near a place in an idle or apparently idle manner: hang[ing] around aimlessly." The record supports the conclusion that defendant's use of the premises as a residence can be characterized as loitering.

§ 101–20.312 proscribes "[t]he blocking of entrances, driveways, [or] walks." Defendant's bedroll is situated on the portico. While it does not obstruct the entrances to the building, it nevertheless blocks an area which can be characterized as a "walk" and which would otherwise be open to pedestrian traffic.

■ That defendant's presence may also be expressive does not prevent it from simultaneously being declared a trespass or violation of the Code of Federal Regulations. Rather, once defendant's conduct is declared unlawful, the appropriate inquiry becomes whether these regulations, as applied to defendant, violate his First Amendment rights.

### 2. The Role of the First Amendment

The Government seeks to enjoin the following: defendant's maintenance of his bedroll on federal property and defendant's use of the restrooms in the Russell Building for bathing and laundry. An injunction would bar such conduct from the entire grounds of the Russell Building, including the Building's interior, the portico, and the unenclosed plaza. The Court has already determined that defendant's use of the property as a residence constitutes a trespass and a violation of the Code of Federal Regulations. As a defense, Mr. Gilbert argues that his activity is expressive and therefore protected by the First Amendment.

#### a. Protected Speech

Having found that defendant's use of the premises as a residence constitutes a trespass, the Court must now determine whether an injunction barring such use will unconstitutionally infringe on Mr. Gilbert's First Amendment rights. The First Amendment states that "Congress shall make no law ... abridging the freedom of speech, or of the press; or of the right of the people to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I. The threshold question in any First Amendment case is whether the actor is engaging in the kind of speech which is protected by the First Amendment. *Cornelius v. NAACP Legal Defense and Educational Fund, Inc.,* 473 U.S. 788, 797, 105 S.Ct. 3439, 3446, 87 L.Ed.2d 567 (1985); *White House Vigil for the ERA Committee, et al. v. Clark,* 746 F.2d 1518, 1539 (D.C.Cir.1984). In this case, however, the Court need not decide whether defendant's use of the premises as a residence is expressive conduct and protected by the First Amendment. Like the Supreme Court in *Clark v. Community for Creative Non–Violence et al.,* 468 U.S. 288, 293, 104 S.Ct. 3065, 3068, 82 L.Ed.2d 221 (1984), this Court will assume, without deciding, that Mr. Gilbert's activity is expressive and entitled to First Amendment protection.[5]

---

5. *But see Community for Creative Non–Violence* *v. Watt,* 703 F.2d 586, 622 (D.C.Cir.1983) (Scalia,

**1561**

### b. The Public Forum Doctrine

In public fora, "tolerance for inhibitions on speech, petition, and assembly is at a minimum," and the burden on the Government to justify any abridgement is at its highest. L. Tribe, *American Constitutional Law* § 12–23, at 981. The regulation upheld in *Clark* prohibited camping in a national park, a quintessential public forum. *Clark*, 468 U.S. at 290, 104 S.Ct. at 3067. Thus, if the Government's regulation of defendant Gilbert's activities can survive the test applied in *Clark*, the Government may constitutionally enjoin him from residing anywhere on the grounds of the Russell Building.

### c. Time, Place, and Manner Restrictions

In *Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 104 S.Ct. 3065, the Court was confronted with the question of whether a National Park Service Regulation prohibiting camping in certain parts of Lafayette Park and on the Mall in Washington, D.C., violated the First Amendment rights of demonstrators who wanted to sleep there to protest the plight of the homeless. *Id.* at 290, 104 S.Ct. 3065. Recognizing that the Park and the Mall were quintessential public fora and assuming that sleep was protected speech, the Court nevertheless held that a restriction on camping did not violate the demonstrators' First Amendment rights:

> These provisions, including the ban on sleeping, are clearly limitations on the manner in which the demonstration could be carried out. That sleeping, like the symbolic tents themselves, may be expressive and part of the message delivered by the demonstration does not make the ban any less a limitation on the man-

ner of demonstrating, for reasonable time, place, or manner regulations normally have the purpose and direct effect of limiting expression but are nevertheless valid. [citations omitted] Neither does the fact that sleeping *arguendo*, may be expressive conduct, rather than oral or written expression, render the sleeping prohibition any less a time, place, or manner regulation.

*Id.* at 294–95, 104 S.Ct. at 3069–70.

Reasonable time, place, and manner restrictions pass constitutional muster if they are content-neutral, are narrowly tailored to further a significant governmental interest, and if they leave open alternative channels of communication. *Clark*, 468 U.S. at 295, 104 S.Ct. at 3070; *Perry Education Association v. Perry Local Educators' Association*, 460 U.S. 37, 45, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983); *United States v. Belsky*, 799 F.2d 1485, 1488 (11th Cir. 1986). The Court in *Clark* found that the no-camping regulation satisfied each requirement: it was being applied evenly and without regard to the substance of the protest; it allowed the demonstrators to communicate their anger over the plight of the homeless in many other ways; and it was narrowly tailored to further the governmental interest in preserving the aesthetics of the national parks. *Clark*, 468 U.S. at 295–96, 104 S.Ct. at 3070–71.

An injunction aimed at enjoining defendant's use of the Russell Building as a residence, that is barring him from sleeping on the portico or anywhere else on the plaza and barring him from using the restrooms to bathe and do laundry, is also a reasonable time, place, and manner restriction.[6] First, such an injunction would be content-neutral. While the injunction tar-

J., dissenting), *rev'd, Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984) ("I write ... flatly to deny that sleeping is or ever can be speech for First Amendment purposes.").

The record in this case supports an argument that defendant's activities do not constitute expressive conduct worthy of First Amendment protection. However, for purposes of this Order, the Court need not decide that issue.

**6.** Courts have often upheld time, place, and manner restrictions which also, incidentally,

limit speech on public property. *See generally Members of the City Council of the City of Los Angeles v. Taxpayers for Vincent et al.*, 466 U.S. 789, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984) (The Supreme Court held that an ordinance prohibiting the posting of signs on public property was constitutional even as applied to the expressive activities of a group of supporters of a political candidate.); *Grayned v. City of Rockford*, 408 U.S. 104, 115–16, 92 S.Ct. 2294, 2302–03, 33 L.Ed.2d 222 (1972) (Court upheld constitutionality of antinoise ordinance, thereby limiting speech on a public street.).

gets defendant Gilbert alone, never before has someone established a permanent residence on the grounds of the Russell Building. There is no evidence that the Government is seeking this injunction because it disagrees with the content of defendant's message, nor is this a situation where the conduct is so directly related to the message that regulating conduct necessarily regulates content.

Second, such an injunction can be narrowly tailored to further the significant governmental interest in preserving the aesthetics of the Russell Building. Courts have consistently found that "the [G]overnment has a substantial interest in the preservation and enhancement of the human environment; aesthetics are a proper focus of governmental regulation." *White House Vigil,* 746 F.2d at 1528; *see also Clark,* 468 U.S. at 299, 104 S.Ct. at 3072. In *Clark,* the Supreme Court noted that it would not replace the Park Service as manager of the nation's parks. It stated that time, place, and manner cases did not "endow the judiciary with the competence to judge how much protection of park lands is wise and how that level of conservation is to be attained." *Clark,* 468 U.S. at 299, 104 S.Ct. at 3072. Similarly, this Court will not replace GSA as caretaker for the Russell Building and its grounds, and substitute its aesthetic judgment for that of GSA. GSA has a legitimate interest in preserving the aesthetics of the Russell Building and in providing the public better access to the walkways surrounding it. The injunction can be narrowly tailored to accommodate those interests.

Finally, such an injunction would leave open many alternate channels of communication. The injunction will bar him from using the premises as a residence but he is free to engage in protest: he may chant, leaflet, picket, march, etcetera. Defendant can demonstrate on the unenclosed plaza and reach the very same audience.

**B.** **First Amendment Activity on the Portico and in the Interior of the Russell Building**

██ The above discussion deals exclusively with the first, second, and fifth prongs of the Government's proposed in-

junction. *See supra* pp. 11–18. The Court will now address the third and fourth prongs: that defendant refrain from any "disruptive conduct" inside the Russell Building and that he not engage in any First Amendment activity inside the Building or on the portico. The Court is unwilling to issue an injunction enjoining defendant from "disruptive behavior," for that characterization is both vague and overbroad. If defendant creates a disturbance that rises to the level of criminal conduct, the Government may resort to the criminal justice system for recourse. *S.E.C. v. Carriba Air, Inc. et al.,* 681 F.2d 1318, 1321 (11th Cir.1982) (Although some narrow exceptions exist, "[t]o the present day, 'equity will not enjoin a crime' is one of the principles of Anglo–American jurisprudence.")

Similarly, if the Government is seeking to enjoin classic First Amendment activity, without delineating the nature of the Government interest contravened or describing the activity sought to be enjoined, then the injunction would appear to be an invalid prior restraint on speech. *See Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 559, 95 S.Ct. 1239, 1246, 43 L.Ed.2d 448 (1974) ("[A] free society prefers to punish the few who abuse rights of speech *after* they break the law than to throttle them and all others beforehand.") Therefore, the Court will limit its analysis to defendant's activity which can be characterized as a demonstration or protest. Even so, the Government's attempt to interfere with defendant's First Amendment right to engage in protest or demonstration requires increased scrutiny both of the Government interests involved and of the extent to which communicative activity is in fact inhibited.

### 1. The Public Forum Doctrine

The Court must again begin with the question of whether demonstration or protest on the portico constitutes an unlawful trespass. The issue of trespass here, however, is intertwined with the First Amendment issues which pervade this case. To determine "the use to which the [Russell Building's portico] is lawfully dedicated," is

in First Amendment parlance, to characterize the portico as a public or nonpublic forum. *Adderley*, 385 U.S. at 47, 87 S.Ct. at 247. Resolution of the former answers the question of trespass. Resolution of the latter determines what standards to apply to Government restrictions on speech on the portico. Therefore, the Court will discuss both in the context of the public forum doctrine.

### a. The Portico

"Even protected speech is not equally permissible in all places and at all times." *Cornelius*, 473 U.S. at 799, 105 S.Ct. at 3447. Limitations on First Amendment activity depend, in part, on where one chooses to engage in expressive activity. This "location-specific dimension" of First Amendment analysis has evolved into the public forum doctrine. L. Tribe, *American Constitutional Law* § 12–24, at 987 (1988). "In some places, some activities are said to be entitled to greater First Amendment protection than the same activities may claim in other places. The designation 'public forum' thus serves as shorthand for the recognition that a particular context represents an important channel of communication in the system of free expression." *Id.*

In *Perry Education Association v. Perry Local Educators' Association et al.*, 460 U.S. 37, 45–46, 103 S.Ct. 948, 954–955, 74 L.Ed.2d 794 (1983), the Supreme Court identified three categories of public property: (1) the traditional or quintessential public forum, (2) the state-created public forum, and (3) the nonpublic forum. *Id.* at 45–46, 103 S.Ct. at 954–955. Streets, sidewalks, and parks are all traditional public fora, as each has "immemorially been held in trust for the use of the public and, time out of mind, ha[s] been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Id.* at 45, 103 S.Ct. at 955 (quoting *Hague v. CIO*, 307 U.S. 496, 515, 59 S.Ct. 954, 963, 83 L.Ed. 1423 (1939). The second category consists of public property which the state has deliberately opened to the public as a place to engage in expressive activity. *Perry*, 460 U.S. at 45, 103 S.Ct. at 955. The third category consists of public property which has not traditionally or by designation, been opened to the public for First Amendment activity. *Id.* at 46, 103 S.Ct. at 955.

■ The unenclosed plaza area surrounding the Russell Building may not be characterized as a quintessential public forum but does fall squarely within the definition of a state-opened public forum. Traditionally, the plaza has been available to the public for a panoply of First Amendment activity. At the summary judgment hearing, a GSA official testified that "we will allow almost any demonstration [at the Russell Building] if you will contact us and we will issue a permit." Transcript at 115. Both GSA officials and defense witnesses testified that many demonstrations had also taken place on the unenclosed plaza without permits. *Id.* at 116, 140. In sum, the record is replete with evidence that public protest has been allowed on the unenclosed steps and plaza surrounding the Russell Building.

■ The portico area is distinguishable from the unenclosed plaza and therefore must be analyzed independently. The portico is covered by the upper floors of the Building, enclosed on one side by the glass wall of the Russell Building's lobby, and partially enclosed on the opposite side by large concrete columns which support the upper floors. Six such columns line the Spring Street side of the Building. The Government contends that the portico, like the interior of the Building, is a nonpublic forum. Conversely, defendant maintains that the portico is analogous to the unenclosed plaza and at the very least, a state-opened public forum.

In *Cornelius v. NAACP Legal Defense and Education Fund*, 473 U.S. at 802, 105 S.Ct. at 3449, the Supreme Court explored the parameters of the state-opened public forum:

> The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse. [citation omitted] Accordingly, the Court has looked to the policy and practice of the government to ascertain

whether it intended to designate a place not traditionally open to assembly and debate as a public forum. 460 U.S., at 47, 103 S.Ct., at 956. The Court has also examined the nature of the property and its compatibility with expressive activity to discern the government's intent. *See also United States v. Grace et al.,* 461 U.S. 171, 177, 103 S.Ct. 1702, 1707, 75 L.Ed.2d 736 (1983). After an examination of the policy and practice of GSA with regard to the portico, the Court concludes that it was not designated by the Government as a place for assembly, speech, or the free exchange of ideas.

GSA has an unwritten policy of excluding demonstrators from the portico. Transcript at 117, 124. GSA officials and federal protective officers indicated that demonstrators who entered into that area during the course of a protest have always been asked to move out into the unenclosed plaza. *Id.* at 101–03, 117. The record contains no evidence that GSA ever deliberately opened up the portico as a public forum for First Amendment activity. Some defense witnesses testified that they had used the portico during demonstrations, but evidence of "isolated instances of undiscovered violations" does not create a genuine issue of material fact. *Clark,* 468 U.S. at 295, n. 6, 104 S.Ct. at 3070, n. 6.

Moreover, the portico area is not compatible with expressive activity. It is bounded on one side by the glass wall of the lobby and is partially enclosed on the other side by large concrete columns. The portico is an integral part of the federal office building. The interests of safety and unobstructed ingress and egress dictate that the portico was intended to be kept free from all but transient pedestrian traffic. Consequently, the Court finds that the portico area surrounding the Russell Building is a nonpublic forum.

### b. The Interior of the Building

■ Whether the interior of the Russell Building constitutes a public forum poses a much simpler question. The interior of the Building is certainly not a quintessential public forum and nothing in the record indicates that it was ever deliberately opened to the public as a forum for expressive activity.[7] *See* transcript at 117. "That such activity occurs in the context of the forum ... does not imply that the forum thereby becomes a public forum for First Amendment purposes.... The federal workplace, like any other place of employment, exists to accomplish the business of the employer." *Cornelius,* 473 U.S. at 804–05, 105 S.Ct. at 3450–51. Thus, for First Amendment purposes, the interior of the Building can only be considered a nonpublic forum.

### c. Applicable First Amendment Standard

■ As noted earlier, the characterization of the portico and the interior of the Building as nonpublic fora, has two implications. First, use of that area for protest contravenes the purpose for which the portico was dedicated and therefore constitutes an unlawful trespass. *Adderley v. Florida,* 385 U.S. 39, 47, 87 S.Ct. 242, 247, 17 L.Ed.2d 149 (1966) ("The State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated."); *Brooks v. The State,* 170 Ga. App. 440, 441, 317 S.E.2d 552 (1984). Second, the Government's ability to restrict speech in nonpublic fora is greater and attempts to do so are examined by the courts with minimal scrutiny. *Perry,* 460 U.S. at 46, 103 S.Ct. at 955 ("In addition to time, place, and manner regulations, the State may reserve the [nonpublic] forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view.").

The Supreme Court stated in *Cornelius* that:

[t]he Government's decision to restrict access to a nonpublic forum need only be

---

7. Witnesses did testify that the interior of the Building had been the situs of a press conference called by the United States Attorney, Robert Barr. Transcript at 67–68, 74. Mr. Barr works in the Russell Building and his use of the lobby for a press conference does not convert the Building into a public forum.

*reasonable;* it need not be the most reasonable or the only reasonable limitation. In contrast to a public forum, a finding of strict incompatibility between the nature of the speech or the identity of the speaker and the functioning of the nonpublic forum is not mandated. [citations omitted] ... Nor is there a requirement that the restriction be narrowly tailored or that the Government's interest be compelling. The First Amendment does not demand unrestricted access to a nonpublic forum merely because use of that forum may be the most efficient means of delivering the speaker's message.

*Cornelius,* 473 U.S. at 808–09, 105 S.Ct. at 3452–53.

In the case at bar, an injunction enjoining Mr. Gilbert from demonstrating or protesting on the portico or in the Building passes constitutional muster. It is aimed not at the suppression of speech, but rather seeks to regulate the time, place, and manner in which Mr. Gilbert can conduct his protest. The Government presented enough evidence to establish that the portico has never been opened as a public forum and that GSA has consistently worked to keep that area free from any and all demonstrators. *See supra* pp. 1556–57. Defendant is entitled to no exception.

An injunction which leaves open many alternate channels of communication satisfies a reasonableness test. Defendant Gilbert is free to continue his protest on the unenclosed steps and plaza, which begin only thirty feet outside the walls of the Russell Building. The unenclosed plaza occupies a large portion of a city block and affords Mr. Gilbert and all others a forum in which to attract the attention of the courts, the public, and the media.

## V. *Conclusion*

Former Chief Justice Burger would characterize defendant Gilbert's protest as he did the demonstrations in *Clark:*

> Respondent's attempt at camping [on the portico] is a form of "picketing"; it is conduct, not speech. Moreover, it is conduct that interferes with the rights of others to use [public areas] for the purposes for which [they were] created....

> It trivializes the First Amendment to seek to use it as a shield in the manner asserted here. And it tells us something about why many people must wait for their "day in court" when the time of the courts is preempted by frivolous proceedings that delay the causes of litigants who have legitimate, non-frivolous claims.

*Clark,* 468 U.S. at 300–01, 104 S.Ct. at 3072–73 (Burger, J., concurring).

Admittedly, defendant has exhibited a great deal of tenacity in expressing his dissatisfaction with the judiciary. He has, for eight years, persisted in his challenge to the power of the Federal Government. However, the Court cannot allow sympathy to cloud its respect for the constitutional balance struck between the rights of the individual and those of the community. This balance, articulated in *Clark,* dictates that defendant cannot continue his protest in its present form, at its present location. That defendant has free and ready access to alternate channels of communication confirms that the balance struck is proper as applied to defendant.

For the foregoing reasons, plaintiff's Motion for Summary Judgment is GRANTED and defendant's Motion for Summary Judgment is DENIED. The Government is DIRECTED to file with the Court and to serve defendant Gilbert and defense counsel, with a proposed injunction which comports with the findings of this Order. The proposed injunction shall be served within ten (10) days of the entry of this Order and defendant will then have ten (10) days in which to respond.

SO ORDERED.